The City of Chicago

v.

John McKechney *et al.*

*Opinion filed October 26, 1903—Rehearing denied December 16, 1903.*

1. Evidence—*when letters from agents to principal are not admissible.* Letters written to a water tunnel contractor by agents paid by him to examine the work and report their conclusions as to whether it was properly done, are not admissible in evidence in favor of the contractor in litigation against the city growing out of the contract under which the work is done.

2. Same—*letter written by party not admissible in his favor.* A letter written by a party is not admissible in evidence in his favor except to show notice or demand, and the fact that such letter remained unanswered does not tend to show acquiescence on the part of the party receiving it.

3. Same—*what does not render letters from third persons admissible.* Letters or reports written to a public contractor by agents which he has himself employed and paid, are not rendered admissible in his favor, in litigation against the city, by the fact that he showed them to the commissioner of public works, who read them without comment.

4. Same—*what necessary to make declarations part of the res gestæ.* To be a part of the *res gestæ*, a declaration, whether verbal or written, must affect the act which is the subject of inquiry, and explain, illustrate or in some way characterize it, and must not be narrative of a past transaction.

5. Municipal Corporations—*when contractor may recover reasonable value of extra material and labor.* The reasonable value of labor and material not covered by the original contract for a public improvement, but which were furnished by the contractor and accepted by the city, may be recovered, where the supplemental agreement under which the contractor acted in furnishing such labor and material was not binding on the city.

6. Appeals and Errors—*effect of prejudicial remarks by court not necessarily cured by instruction.* The effect of prejudicial remarks made by the court in the presence of the jury is not necessarily obviated or cured by instructions afterwards given to the jury to disregard such remarks.

Hand, C. J., Wilkin, Cartwright and Boggs, JJ., specially concurring.

*City of Chicago* v. *McKechney,* 91 Ill. App. 442, reversed.

Appeal from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. Elbridge Hanecy, Judge, presiding.

This is an action of assumpsit, brought on December 8, 1897, in the circuit court of Cook county by Frederick C. Weir, since deceased, and the appellees, John Mc-Kechney and John McKechney, Jr., then constituting the firm of Weir, McKechney & Co., against the appellant, the city of Chicago. The trial, which began before the court and a jury on June 23, 1899, resulted in a verdict in favor of the plaintiffs below and against the city, on July 15, 1899, for $619,638.81. Afterwards, during the argument for a new trial, a *remittitur* of $64,078.59 was entered, and on August 29, 1899, judgment was rendered against the city for $555,560.22 and costs, in favor of the present appellees. An appeal was taken from this judgment to the Appellate Court, where the judgment was affirmed, and the present appeal is prosecuted from such judgment of affirmance.

On March 10, 1899, the death of Frederick C. Weir, one of the plaintiffs, was suggested upon the record, and the cause was ordered to proceed at the suit of the surviving plaintiffs, John McKechney and John McKechney, Jr., the present appellees.

The suit is brought to recover for work done in the construction of section 3 of what is called the north-west land tunnel, built for the purpose of conducting water to the north-west quarter of the city of Chicago, and running from a point on North Green street in that city, near Grand avenue, in a north-westerly direction to a point in section 35, town 40, range 13, east of the third principal meridian.

On August 20, 1895, the department of public works advertised for bids for the construction of said tunnel, and in the advertisement announced that sealed proposals

would be received by the city until 11 A. M. August 31, 1895, for furnishing all material and constructing a water tunnel under the city of Chicago with necessary shafts. The advertisement described section 3 as "tunnel eight feet internal diameter, from junction of ten and eight-foot tunnels at or near Green street, in a north-westerly direction; * * * all with necessary shafts, according to plans and specifications on file in the office of the department of public works of said city." Said Weir and appellees put in the lowest bid for the construction of said tunnel, and therein stated as follows: "The undersigned hereby propose to do all the work and furnish all the material necessary in the construction of the water tunnels * * * from North Green street north-westerly, * * * according to the specifications hereto attached, at the following rate of prices:

"Sec. 3. Shafts, ten feet internal diameter, per lineal foot, $69.50. Tunnel in earth, eight feet internal diameter, per lineal foot, $16.65. Tunnel in rock, eight feet internal diameter, per lineal foot, $15.90. Rock excavation over and above cost of lineal foot of tunnel or shaft, per cubic yard, $2.00. Cast iron in covers, etc., per pound, .05.

"The undersigned also agree to a deduction of $200.00 per day for each and every day after the expiration of the time named in these specifications that the work is not completed. The undersigned hereby certify that they have read the foregoing specifications, and that the proposal of the work is based on the conditions and requirements embodied therein, and, should the contract be awarded to them, they agree to execute the work in strict accordance herewith. The above proposal is based upon the conditions and stipulations named in the advertisement inviting proposals for such work, material or supplies, and in accordance with the specifications and plans prepared for the same on file in the office of the department of public works. And should the commissioner of

public works award the contract to the undersigned, then the undersigned agree to do such work or furnish such material or supplies upon the terms and conditions prescribed in the said advertisement, specifications and plans referred to, and hereby agree to enter into such contract with said city within such time and in such manner as shall be required by such commissioner for the doing of such work or the furnishing of such material or supplies," etc.   The above proposal and bid, and agreement embodied therein, were signed by Weir and the appellees.

Thereupon, on October 19, 1895, a contract was entered into between Weir and appellees composing the firm of Weir, McKechney & Co. of Chicago, parties of the first part, and the city of Chicago of the second part. Said contract of October 19, 1895, with the specifications thereto attached, is as follows:

"This agreement, made and concluded this 19th day of October, A. D. 1895, between Fred C. Weir, John Mc-Kechney and John McKechney, Jr., composing the firm of Weir, McKechney & Co., of the city of Chicago, county of Cook and State of Illinois, parties of the first part, and the city of Chicago of the second part:

"*Witnesseth*, That the said parties of the first part, for and in consideration of the payments to be to them made by the said city of Chicago, as hereinafter set forth, hereby covenant and agree to build and construct a water tunnel and shafts in said city from a point on North Green street, near Grand avenue, in a north-westerly direction, to a point in section 35, town 40, range 13, east of third principal meridian, according to the terms, conditions and directions set forth in the plans and specifications hereto attached and made a part hereof, same being designated in said specifications as 'third section, eight feet internal diameter.' It is expressly understood and agreed that all material and excavation taken from the first or easternmost shaft of said section 3 of said tunnel shall

be transported, at the expense of said contractors and for the use of said city for filling, to such point within the limits of the so-called proposed Lake Front Park as the commissioner of public works may direct, or the same shall be so delivered at any other place or places, not exceeding two and one-half (2½) miles from the top of such shaft, as the commissioner of public works may from time to time direct; and in case the said commissioner of public works, acting for and upon behalf of the city, shall not desire to use any part or portion of such material for filling purposes, then it shall be the duty of said contractors to remove the same at their own expense. The said Weir, McKechney & Co. further agree to have all of said work finished and fully completed on or before the first day of October, A. D. 1897; and further, that in case of their neglect, failure or refusal to so complete said tunnel and shafts within the time herein agreed upon, then in such event they hereby agree to forfeit to the city of Chicago the sum of two hundred ($200.00) dollars per day for each and every day after said first day of October, A. D. 1897, that said work shall remain unfinished, and further agree and direct that such sums of money so forfeited shall be retained by said city from any money due and owing to said first parties by said city under this contract, and shall be paid into the city treasury as liquidated damages. All of the material used in said work, manner, time and place of doing said work, together with all things therewith connected, must be in each and every particular satisfactory to said commissioner of public works. Said work shall be done in accordance with plans prepared for the doing of the same, on file in the office of the department of public works of said city, and with the specifications appended hereto and made a part of this contract. Said work shall be commenced on or before the first day of November, A. D. 1895, shall progress regularly and uninterruptedly after it shall have been begun, excepting as shall be

otherwise ordered by the commissioner of public works, and be finished and fully completed on or before the first day of October, A. D. 1897, the time of commencement, rate of progress and time of completion being essential conditions of this contract. All the work shall be executed in the best and most workmanlike manner, and no improper materials shall be used, but all materials of every kind shall fully answer the specifications, or, if not particularly specified, shall be suitable for the place where used.

"Should the commissioner of public works deem it proper or necessary, in the execution of the work, to make any alterations which shall increase or diminish the expense, such alterations shall not vitiate or annul the contract or agreement hereby entered into, but the said commissioner shall determine the value of the work so added or omitted, such value to be added to or to be deducted from the contract price, as the case may be.

"The whole of the work shall be commenced and carried on when and where the commissioner of public works shall direct, and it shall be carried on regularly, so as to give the necessary time for each part to settle and harden, and also for other purposes, as the commissioner may require. In case the commissioner of public works shall think that this is not sufficiently heeded, he may order more men to be employed upon the work, and if he shall think the work proceeding too rapidly, he may order the employment of a less number of men. Should the weather be unusually wet, or so cold and frosty that any part of the work cannot be done in a proper manner or with due regard to durability, or should such be the case from any other cause, then the commissioner of public works may order such part of the work to be suspended altogether until a more suitable season, in which case the parties of the first part shall cover and otherwise sufficiently protect the several parts of the work, so that they will not be injured by the weather.

"The said parties of the first part hereby covenant and agree, that if, in the prosecution of said work, it shall be necessary to dig up, use or occupy any street, alley, highway or public grounds of said city, to erect and maintain such strong and substantial barriers, and also, during the night time, such lights, as will effectually prevent the happening of any accident or harm to life, limb or property in consequence of such digging up, use or occupancy of said street, alley, highway or public grounds; and it is further covenanted and agreed that the said party of the first part shall be liable for all damages occasioned by the digging up, use or occupancy of any street, alley, highway or public grounds, or which may result therefrom, or which may result from the carelessness of such contractor or contractors, his or their agents, employes or workmen.

"This agreement shall not be assigned or any part of the work sub-contracted without the written consent of the commissioner of public works endorsed hereon; and in no case shall such consent relieve the parties of the first part from the obligations herein entered into by the same or change the terms of this agreement.

"It is hereby provided and agreed that the said work shall be prosecuted with such force as the commissioner of public works shall deem adequate to its completion within the time specified, and if at any time the said parties of the first part shall refuse or neglect to prosecute the work with a force sufficient, in the opinion of said commissioner, for its completion within said specified time, or if, in any event, the said parties of the first part shall fail to proceed with the work in accordance with the requirements and the conditions of this agreement, that the said city, by its commissioner of public works, shall have full right and authority to take the work out of the hands of the said parties of the first part and to employ other workmen to complete the unfinished work, and to deduct the expenses thereof from any money that

may be due and owing to said parties of the first part on account of the work, or to re-let the same to other contractors, as provided for hereinafter. And the said parties of the first part covenant and agree to perform all of said work under the immediate direction and superintendence of the commissioner of public works of the city of Chicago, and to his entire satisfaction, approval and acceptance. All material used and all labor performed shall be subject to the inspection and the approval or rejection of said commissioner, and the said city of Chicago hereby reserves to its commissioner of public works the right finally to decide all questions arising as to the proper performance of said work and as to whether the rate of progress thereon is such as to correspond with the conditions of this contract; and if the said work shall not be begun at the time herein stipulated, or if the rate at which said work shall be performed shall not, in the judgment of said commissioner, be such as to insure its progress and completion in the time and manner herein stipulated, or if said work shall be wholly or in part improperly constructed, then to declare this contract forfeited, either as to a portion or the whole of said work, and to re-let the same, or to order the entire re-construction of said work if improperly done, and in such case of default, or in any case of default, to adjust the difference of damage or price (if any there be) which, according to the just and reasonable interpretation of this contract, the said contractors should, in the opinion of said commissioner, pay to the said city for any failure to properly commence and prosecute or to properly construct said work, in all respects, according to the conditions hereinbefore specified, or for any other default. And it is hereby understood and agreed, that for any amount of damage or price determined by said commissioner to be paid to said city by said contractor for any such default, or for any money paid out by said city on account of said contractor in consequence of any default, there shall be

applied in payment thereof a like amount of any money that may be due and owing to said party of the first part on account of said work, so far as there may be any such money and so far as the same shall be sufficient; and if there shall not be a sufficient amount retained from the said party of the first part, then and in such case the amount to be paid to said city in consequence of such default shall be a just claim against said contractors, and shall be recovered from him or them at law, in the name of the city, before any court of competent jurisdiction.

"In case the said commissioner of public works shall deem it necessary to declare any portion or section of said work forfeited, it is hereby expressly stipulated and understood such declaration of forfeiture shall not in any way relieve the contractors from the covenants and conditions of this contract, but the same shall be and remain valid and binding on said contractors. And it is understood and agreed that no claim whatever will be made by the said parties of the first part for extra work or material, or for a greater amount of money than is herein stipulated to be paid, unless some changes in or additions to said work, requiring additional outlay by said parties of the first part, shall first have been ordered, in writing, by the said commissioner of public works.

"The said city of Chicago hereby covenants and agrees, in consideration of the covenants and agreements in this contract specified to be kept and performed by the said parties of the first part, to pay to said parties of the first part when this contract shall be wholly carried out and completed on the part of said contractors and when said work shall have been accepted by said commissioner of public works, the following prices, to-wit: Shafts, ten (10) feet internal diameter, sixty-nine dollars and fifty cents ($69.50) per lineal foot; tunnel in earth, eight (8) feet internal diameter, sixteen dollars and sixty-five cents ($16.65) per lineal foot; tunnel in rock, eight (8) feet internal diameter, fifteen dollars and ninety cents

($15.90) per lineal foot; rock excavation, over and above cost of lineal foot of tunnel or shaft, two dollars ($2.00) per cubic yard; cast-iron in covers, etc., five cents (.05) per pound.

"It is further agreed, that in case the said contractor or contractors shall abandon or in any way or manner fail to complete said work, the city of Chicago is hereby authorized and empowered to pay to any laborer or laborers who may have been employed by such contractor or contractors upon the above described work, out of the funds due said contractor or contractors, upon the estimates of the commissioner of public works, at the time said commissioner shall declare said contract forfeited, any and all sums of money which may be found to be due and owing to such contractor or contractors under this contract, and without giving any notice whatsoever to said contractor or contractors of the intention so to do. And in every such case the city comptroller is hereby authorized and empowered to ascertain the amount or amounts so due and owing to any such laborer or laborers from said contractor or contractors in such manner and upon such proof as he may deem sufficient, and without giving any notice of such proceedings to said contractor or contractors. And the amount or amounts so found by him to be due and owing to such laborer or laborers shall be final and conclusive as against said contractor or contractors, and may thereafter be paid over by said city to such laborer or laborers, and no estimate will be issued to said contractor or contractors until all claims for labor on this contract shall have been satisfied.

"It is also agreed by said city, that if the rate of progress shall be satisfactory to said commissioner of public works, estimates in its usual form will be issued to said party of the first part, during the making of said improvements, for eighty-five (85) per cent of the value of the work done and in place at the time of issuing such esti-

mate, the remaining fifteen (15) per cent being reserved until the final completion and acceptance of said work.

"No payment will be made for any extra work not specified in this contract unless such extra work shall have been done by the written order of the commissioner of public works, to be attached to such contract, directing the same, and stating that such work is not included in the contract, what the extras are, and that such extras are necessary for the proper completion of or for the security of the work previously done, and the reasons therefor.

"In testimony whereof the said parties of the first part have set their hands and seals, and the said city of Chicago has caused this agreement to be signed by its commissioner of public works, countersigned by its comptroller and approved by its mayor, the day and year above written.

Fred C. Weir,    [Seal.]
John McKechney,    [Seal.]
John McKechney, Jr.,    [Seal.]
W. D. Kent, *Comr. of Public Works,*
By John A. Moody, *Deputy.*

Countersigned: O. D. Wetherell, *Comptroller.*

Approved: Geo. B. Swift, *Mayor.*"

"Specifications for the construction of a water tunnel from Green Bay Park, near intersection of Cass and Rush streets, to a point west of Rockwell street; also a tunnel from a point on North Green street, near Grand avenue, in a north-westerly direction to a point in Sec. 35, T. 40, R. 13, E. of 3d P. M., in the city of Chicago.—*August, 1895.*

LOCATION AND GENERAL DESCRIPTION.

"The tunnel will be located within the area shown colored on the plat attached to these specifications. The inside diameter of the tunnel, from the beginning at Green Bay Park, near the intersection of Cass and Rush streets, to North Green street, will be ten (10) feet, and the extension of the tunnel from this point to the terminus west of Rockwell street will be eight (8) feet internal

diameter. From the shaft where the ten and eight-feet tunnels join there will be a tunnel eight (8) feet internal diameter built in a north-westerly direction to a point in Sec. 35, T. 40, R. 13, E. of 3d P. M.

### TUNNELS.

"FIRST SECTION: 10 ft. internal diameter.    } From commencement to North Green street, near Grand avenue.

"The clear width of the tunnel shall be ten (10) feet and the clear height ten feet two inches. The top and bottom arches shall be semi-circles. The tunnel shall be lined with bricks in four rings, or about eighteen inches in thickness.

"SECOND SECTION: 8 ft. internal diameter.    } From shaft at west end of ten-feet tunnel to the terminus west of Rockwell street.

"The clear width of the tunnel shall be eight (8) feet and the clear height eight feet two inches. The top and bottom arches shall be semi-circles. The tunnel shall be lined with brick masonry in three rings, or about thirteen inches in tickness.

"THIRD SECTION: 8 ft. internal diameter.    } From intersection of the ten and eight-feet tunnels on North Green street to a point in Sec. 35, T. 40, R. 13, E. of the 3d P. M.

"The clear width of the tunnel shall be eight (8) feet and the clear height eight feet two inches. The top and bottom arches shall be semi-circles. The tunnel shall be lined with brick masonry in three rings, or about thirteen inches in thickness.

### GRADES AND ALIGNMENTS.

"The tunnels shall be built on such lines and grades as may be determined by the city engineer. The depth of the center line of the tunnel will be approximately between seventy-five and eighty-five feet below the Chicago city datum.

### SHAFTS.

"There will be two shafts for gates, to be twelve feet internal diameter, located over the tunnels, one at the

commencement at Green Bay Park and the other at the junction of the ten-feet and of the eight-feet tunnels on North Green street. In addition there will be a number of shafts to be located by the city engineer, on section 2 not less than three and on section 3 not less than four. The shafts shall be lined with brick masonry, not less than eighteen inches or four rings in thickness, and when completed the inside surface shall be perfectly plumb, true and cylindrical, and the joints between the bricks not over one-half inch in thickness. The courses must be horizontal, and all joints in the masonry must be perfectly filled by pressing the bricks in the cement mortar, and not by pressing the mortar between the bricks. The surface shall be pointed smooth and cleaned as the work progresses. The eyes or openings for the tunnels in the shafts shall be neatly groined. There shall be built in all shafts, ladder irons from top to bottom, these to be of such form, number and size as directed by the city engineer. The tops of all shafts shall be domed over and provided with cast-iron covers and frames, according to detailed drawings to be furnished.

MATERIAL AND CONSTRUCTION.
BRICKS.

"All bricks used in the work shall be first-class sewer bricks, made of well tempered and puddled clay, free from lime and pebbles. They shall be hard burned, clear ringing and well formed. The size shall be uniform, viz., $8''x4''x2\frac{1}{2}''$, and they will be carefully inspected by the city, and immediately rejected if not up to the standard required.

CEMENT MORTAR FOR TUNNEL.

"All cement shall be of the best quality of American natural cement, with a tensile strength of the neat material of not less than ninety (90) pounds per square inch after seven (7) days and not less than one hundred and forty (140) pounds per square inch after twenty-eight (28) days' immersion in the water. No cement shall be used

on the work until it has been tested and accepted by the city engineer, and the contractor must furnish storage, capacity, and must keep at least one month's supply on the grounds at all times. All mortar shall be made with one part cement and one part clean, sharp, beach sand from the lake shore, or such sand as may be acceptable to the commissioner of public works, and it shall be used as soon as possible after being mixed. (Dredged sand will not be allowed on the work).

### BORINGS.

"Borings have been made by the city near the proposed routes of the tunnels. The notes from these borings have been platted, and are now on file in the office of the city engineer for the inspection of bidders.

### CONSTRUCTION.

"The contractor must provide a complete plant for the introduction of compressed air to guard against danger or damage in the prosecution of the work and to support the roof of the tunnel. The contractor must take the work entirely at his own risk. No extra allowance will be made for quicksand, hard-pan or boulders. In the earth or clay sections the contractor will not be allowed to excavate, even in good ground, more than can be lined with masonry the same day, and in soft and dangerous ground the contractor will be allowed to excavate only so far in advance of the masonry as the city engineer may consider safe. When the tunnel is wholly in sound rock, the excavation must be kept so far in advance of the masonry that no injury shall be done to the brick lining by blasting. The use of explosives will not be allowed or permitted except in rock excavation. All lumber, timber or other material used for bracing and supporting the sides or roof of the tunnel previous to the completion of the masonry shall be furnished and put in place by the contractor. If the condition of the soil is such that, in the judgment of the city engineer, it becomes

205—25

necessary to leave permanently any timbers or boards used in supporting the soil in the excavation, the contractor will be paid for such lumber at the rate of $10.00 per thousand feet, b. m. The amount of lumber left in the work shall be reduced to what is absolutely necessary. The contractor must furnish and put in place all necessary air pipes and apparatus for ventilating the tunnel, all steam engines and pumps, hoisting apparatus and fixtures for the same, all sheds and shelters for the protection of the workmen and materials, and all necessary tracks and other necessary implements or machinery for removing excavated material out of and taking building material into the tunnel, and he shall keep the streets and public grounds of the city free from all rubbish and debris at all times during the progress of the work.

### MASONRY.

"The tunnels shall be lined with brick masonry, the bricks being laid longitudinally with the tunnel, with the edges toward the center and with toothing joints. The bricks must be clean and thoroughly wet before being laid. Those having smooth surfaces to be used on the inside face of the tunnel, to be laid fair and smooth to line and to a true and cylindrical form. All joints in the masonry must be perfectly filled by pressing the bricks into the cement mortar, and not by pressing the mortar between the bricks. The joints in the courses shall not exceed one-half inch in thickness, and between the rings or shells not less than one-half inch in thickness. All mortar joints shall be carefully struck and smoothed with the surface of the bricks. All refuse mortar to be scraped off, and, with the rubbish of every kind and description, removed daily from the tunnel, which must be kept perfectly clean. The excavation for the tunnel, when through firm clay, shall conform exactly to the outside of the masonry. No extra allowance will be made for quicksand, hard-pan or boulders. When the tunnel is partly

in earth and partly in rock the contractor will be paid an additional price per cubic yard for rock excavation over and above the unit price per lineal foot of tunnel in earth. When the tunnel is in rock the brick lining may, if deemed secure by the city engineer, be reduced one ring less of brick, and in all cases the masonry shall be brought to a true circular section. In every instance all spaces left between the outside of the regular brick work and the excavation shall be filled in with solid brick masonry, but no allowance will be made for such additional work and material.

### SPECIAL AND GENERAL REQUIREMENTS.

"All the materials of whatever kind to be used in the work are to be subject to inspection by the commissioner of public works, and all unsuitable materials will be rejected and must be immediately removed from the work.

"The contractor shall discharge from his employment, when directed by the commissioner of public works, all unfaithful and incompetent workmen and overseers.

"The commissioner of public works must be permitted to remove such portions of the work as he may from time to time think necessary, for the discovery of improper materials or workmanship, and the contractor shall restore such work at his own expense in case it shall have been done improperly, and at the expense of the city of Chicago if done in a proper manner.

"The contractor shall furnish all pumping, transporting, hoisting and other apparatus or machinery, all the tools, all the materials and whatsoever else may be needed, and do all the work of whatsoever nature necessary to complete the work named in these specifications, and to protect the work during its construction, for the price named in the contract. Material from section 3 shall be deposited at such places as the commissioner of public works may direct and in accordance with the conditions relating to same, as set forth in contract hereto attached. The contractor shall furnish men and stakes

sufficient to enable the city engineer to give the necessary lines and levels to construct the work by, and is to render him all necessary assistance, without charge, for any necessary delay of the work while giving lines and levels. He shall maintain suitable signals and lights, to be approved by the commissioner of public works, as a warning to the public, and he shall be held responsible for all damages resulting from neglect or failure to comply with any or all of the above stipulations.

"The contractor shall take away all lumber, timber and stone from the public grounds of the city, and clean out all dirt and rubbish and remove the same, and clean down all masonry and other work, and leave the site clean at the completion of his contract.

"It is understood and agreed that no claim whatever will be made or allowed for extra work or material unless some changes or additions to the work herein specified or shown on the drawings, requiring additional outlay by the contractor, shall have first been ordered in writing by the commissioner of public works.

"The contractor must deliver to the commissioner of public works, on or before the tenth day of each month, a written statement of amount of claims, if any, for extra work done and extra materials furnished during the previous month, or for extra expenses incurred, from any cause whatever, otherwise claims for extras during that month will be forfeited and waived.

"The contractor must guarantee and keep in perfect repair all the work done under this contract during the progress and for one year after the final completion and acceptance of the work, whether the damage be caused by irruption of water, springs, quicksand, gas, or by any other disturbances or causes.

"The contractor will be required to guard the public effectually from liability to accident during the whole progress of the work, both by night and by day, and will be held responsible for any damages the city may

have to pay in consequence of neglect on the part of the contractor,.or any of his agents, to protect the public against such accidents.

"The commissioner of public works reserves the right to make any changes in the foregoing plans and specifications that he may deem desirable or necessary or the emergency of the work may demand, and the contractor shall furnish any additional material and do any additional work required by such changes or emergency at the prices for like work stipulated in the contract.

"If any change which the commissioner of public works shall deem necessary in the foregoing plans and specifications shall lessen the amount of labor and material required, then the contractor shall sustain such a reduction in the amount of his contract as above provided.

"The contractor will receive pay for the amount of work actually done, and shall not be paid for constructive loss for that which may be omitted.

"The proposals of parties bidding for the work are to be made in accordance with the following form, and must include everything described in these specifications or shown on the drawings.

"The work, as a whole, includes furnishing of all material and the construction of shafts and tunnels; all excavations; the pumping; the cleaning out of and off from the entire premises and removal of all refuse; the making of all repairs to the masonry, and the completion, in a thorough and workmanlike manner, of all the work, of every kind and description, included in the foregoing specifications and shown on the drawings ready for use.

"The nature and intent of these specifications are to provide for the work herein enumerated to be fully completed in every detail for the purpose designed, and the contractor hereby agrees to furnish everything necessary for such construction, notwithstanding any omissions in the drawings or specifications. It is further

understood and agreed that these specifications shall be and hereby are declared a part of the contract.

### TIME OF COMPLETION.

"The work described in these specifications shall be commenced immediately after the signing of the contract, and the whole work finished and completed, ready for letting in the water, within two (2) years after the signing of the contract; and it is stipulated and agreed that in the event of the work not being completed at the time herein specified, the contractor shall pay to the city of Chicago the sum of $200.00 per day, as liquidated damages, for each and every day beyond the time stipulated for the completion of said work, until the same is completed, and that the city of Chicago may retain and deduct the amount of such liquidated damages from any estimate or amount otherwise owing to said contractor under this contract.

"If, from the character and condition of the ground through which the tunnel is to be constructed, any unavoidable emergency shall arise from quicksand pockets, then the commissioners of public works shall have the authority to extend the time of completion of the contract, and shall have authority to release the contractor from the enforcement of the penalty herein provided; but such extension of time and release of penalty shall not be granted for any other cause, and shall not be granted by reason of any negligence, incompetency or inefficiency of the contractor or his employes.

### APPROXIMATE ESTIMATE OF QUANTITIES.

"The following is an approximate length of tunnels and shafts to be built under this contract, and the bids will be compared on this basis. The city of Chicago, however, reserves the right to do the whole or any part of this work, or to make such modifications as may be deemed advisable:

"Sec. 1.—6650 lineal feet of ten (10) feet tunnel in earth; 210 lineal feet of twelve (12) feet shaft.

"Sec. 2.—3000 lineal feet of eight (8) feet tunnel in earth; 11,500 lineal feet of eight (8) feet tunnel in rock; 320 lineal feet of ten (10) feet shaft.

"Sec. 3.—2000 lineal feet of eight (8) feet tunnel in earth; 18,000 lineal feet of eight (8) feet tunnel in rock; 440 lineal feet of ten (10) feet shaft.

> FRED C. WEIR,
> JOHN MCKECHNEY,
> JOHN MCKECHNEY, Jr."

The alleged and unsigned contract, dated May 17, 1897, hereafter referred to, is as follows:

"Whereas, a contract in writing, dated the 19th day of October, 1895, was heretofore entered into by and between Fred C. Weir, John McKechney and John McKechney, Jr., composing the firm of Weir, McKechney & Co., of the city of Chicago, county of Cook and State of Illinois, parties of the first part, and the city of Chicago of the second part, whereby said company agreed to construct for said city a certain section or portion of a tunnel, commonly designated as 'third section, eight feet internal diameter,' of the north-western water tunnel, according to the terms of said contract and of the specifications forming a part thereof; and whereas, said specifications provide that in excavating for said section the use of explosives will not be permitted by said city except in rock; and whereas, the material required to be excavated in part of said section has unexpectedly been found to be neither ordinary earth nor solid rock, but a material exceedingly hard in its nature, requiring practically as much use of explosives as rock, and practically incapable of being excavated with any fair degree of progress without use of explosives; and whereas, said company has recently been using explosives in its said work, thereby causing complaints and claims for damages to be made by neighboring residents and property owners; and whereas, controversies have arisen between the parties hereto respecting such use of explosives and

such complaints, and respecting the obligation of said company to protect and indemnify the city against damages and claims for damages resulting from the use of explosives; and whereas, the further satisfactory progress of said work is believed impracticable unless some use of explosives shall be allowed in connection therewith; and whereas, it is desirable to limit the use of explosives as much as possible, whereby the expense of excavation will be increased; and whereas, the parties hereto desire to settle said controversies and to provide for carrying on said work effectively and without injury or annoyance to neighboring residents and property owners; and whereas, there have been delays in the prosecution of said work growing out of a difference of opinion between said contractors and said city of Chicago as to the proper construction to be given to the said contract between said parties bearing date October 19, 1895; and whereas, it will be practically impossible to complete said work within the time provided for in said contract on account of the delays hereinbefore set forth:

"Now, therefore, it is mutually agreed by and between the parties hereto, as follows:

"*First*—Hereafter any material to be excavated of a conglomerate nature, of such a character that satisfactory progress cannot be made without the use of explosives, the same shall be allowed in such manner and in such quantities and to such an extent as may be practicable, and such use of explosives shall at all times be subject to the supervision and control of the commissioner of public works of said city.

"*Second*—Said Weir, McKechney & Co. shall fully protect and keep harmless said city in respect to any and all damages and claims for damages to persons and to property which may arise in consequence of the use of explosives by said Weir, McKechney & Co., by virtue of this supplemental agreement. The amount of any and every judgment which may be recovered against said city

for damages occasioned through the use of explosives by said Weir, McKechney & Co. by virtue of the terms of this supplemental agreement, and the cost incident thereto, shall be a debt due and payable to said city by said Weir, McKechney & Co., and may be deducted from any moneys due and owing by said city to said Weir, McKechney & Co. under said contract. It shall be the duty of the said city to notify the firm of Weir, McKechney & Co. of every such suit made to recover such damages against the said city, and the said Weir, McKechney & Co. shall have the privilege of defending against such claims in every case.

"*Third*—From and after the 15th day of March, A. D. 1897, the said Weir, McKechney & Co. shall be allowed, in estimating for work done on said tunnel as provided for in the contract on October 19, 1895, for all material encountered in earth tunnel that is rock or of such a nature that it is classified as rock, shall be paid for at the rate of six ($6.00) dollars per cubic yard in addition to the lineal foot price. The specifications and the contract of October 19, 1895, covering this allowance are as follows: 'When the tunnel is partly in earth and partly in rock the contractor will be paid an additional price per cubic yard for rock excavation over and above the unit price per lineal foot of tunnel in earth.'

"*Fourth*—It is further agreed that the time for the completion of said tunnel as provided for in the contract of October 19, 1895, viz., October 1, 1897, shall be and the same is hereby extended nine months from the last mentioned date, to-wit, to July 1, 1898.

"*Fifth*—In earth tunnel or in tunnel which is excavated partly in earth and partly in rock, where extra masonry is directed to be placed between the upper quarters, outside the regular specified rings of brick work of the tunnel and the crown bars or planks to protect the work, the same shall be allowed and estimated at the price of ten ($10.00) dollars per cubic yard.

"In testimony whereof the said parties of the first part have set their hands and seals, and the said city of Chicago has caused this supplemental agreement to be signed by its commissioner of public works, countersigned by its comptroller and approved by its mayor, the day and year as above mentioned.

FRED C. WEIR,
*By his Attorney in fact.*
JOHN McKECHNEY,
JOHN McKECHNEY, Jr.,
By....... .... ..............
CITY OF CHICAGO,
By.............. ..............., *Comr. of Public Works.*

Approved:

. .................... ...., *Mayor.*
....................., *Comptroller."*

(Executed in triplicate.)

The letter of Weir, McKechney & Co., addressed to the mayor of the city and dated June 28, 1898, is as follows:

."CHICAGO, *June 28, 1898.*

"*Hon. Carter H. Harrison, Mayor, City of Chicago:*

"DEAR SIR—In accordance with your request and for the purpose of expediting the completion of section 3, north-west land tunnel, we beg to confirm the statement made to your honor and the finance committee of the city council, June 27, 1898, as follows, viz.:

"*First*—That the city pay Weir, McKechney & Co. the amount of their estimate for work done and material furnished during the month of April, 1898, about $30,000.00.

"*Second*—That the city pay Weir, McKechney & Co. such an amount of the fifteen per cent reservation as shall be in proportion to the payments already made to the contractors on sections 1 and 2 of this tunnel.

"*Third*—That the city pay Weir, McKechney & Co. $2806.30 for expenses incurred in pumping water from the different shafts and maintaining the work in good condition from April 21, 1898, to May 23, 1898.

"*Fourth*—That the city pay Weir, McKechney & Co. the amount necessary to pump the water from the various shafts and prepare for the resumption of work.

"*Fifth*—That the city shall issue estimates in regular form twice each month for work which may hereafter be done, but

shall pay on said estimates only the cost of the expense of the work, the balance of said estimates and all other matters in controversy to abide the result of suits now pending.

"In consideration of the above the city of Chicago shall reduce to writing the stipulation heretofore made to try the case Gen. No. 178,643 in the circuit court of Cook county, wherein Frederick C. Weir et al. are plaintiffs and the city of Chicago defendant, on or before July 29, 1898; and the city shall further stipulate that the plaintiffs shall amend their declaration so that the same shall include all matters of difference between the said Weir, McKechney & Co. and the city of Chicago up to the closing of the issues in said case, and that the issues in said case shall be closed not later than July 19, 1898. In case either party to said suit shall desire to appeal the same to the Appellate Court or Supreme Court, either one or both, then both parties agree to expedite the hearing of the same, either by stipulating to have the case advanced on the calendar of the court in which it may be pending, or otherwise, as may be thought best by the party desiring to have the case advanced.

"Very respectfully,          WEIR, MCKECHNEY & Co.
L. D. CONDEE and T. A. MORAN,
          Attys. for Weir, McKechney & Co."

The proceedings of the city council hereafter referred to, and dated July 11, 1898, are as follows:

"The same committee to whom was referred the matter of the delay in the construction of the north-west land tunnel and the claim of Weir, McKechney & Co., submitted a report recommending the adoption of a certain agreement.

"Ald. Powers moved that the report be concurred in, that the resolution therewith be adopted, that the agreement be ratified and that the whole subject matter be published and placed on file. The motion prevailed by yeas and nays, as follows:

"Yeas—Coughlin, Kenna, Cook, Gunther, Alling, Fitch, Ballenberg, Jackson, Cloidt, Connor, O'Brien, Martin, Murphy, Fick, Bennett (8th ward), Novak, Hurt, Cullerton, Biewer, Duddleston, Colson, Francis, Neagle, Little, Ziehn, Beilfuss, Tuite, Smulski, Kunz, Walsh, Oberndorf, Brennan, Conlon, Haberkorn, Powers, Alwart, Brown,

Mangler, Herrman, Upham, Lyman, Olson, Barry, Cannon, Hirsch, Griffith, Walker, Schlake, Kimbell, Butler, McCarthy, Bigane, McInerney, Carey, Reichardt, Boyd, Sproul, Badenoch, Nelson, Mavor, Wiora, Darcy, Bennet (34th ward), Math.—64.   Nays—None.

"The following is the report:

"Your committee would respectfully report, that pursuant to the order of this honorable council, passed on May 23, 1896, they have had under consideration the subject of the delay in the construction of the north-west land tunnel, the causes therefor and the best method of hastening the completion of this great work. The committee invited the commissioner of public works, the city engineer, the corporation counsel and his assistants, the contractors and their counsel, and these gentlemen, through numerous sittings of the committee, have laid before us the causes of the delay and the various contentions of the city and the contractors.

"The pressing need of the early completion of this work is apparent from the reports of the engineering department and of this honorable council which appear throughout the proceedings of this council for the years 1893, 1894, 1895, 1896, 1897 and 1898, and is becoming more urgent as time goes by. The fact that this council, at the request of a great number of citizens, ordered the construction of so stupendous and beneficial a work, which the people of the west side so much need, shows the necessity for its early completion. The efforts that are being made by the department of public works to furnish temporary relief are commendable but wholly inadequate. The delays in construction are caused by differences of opinion between the city officials and the contractors as to the rights of the city and the contractors under contracts for the construction of the tunnel, and as to section 3, under a certain supplemental agreement which has been acted upon during a long course of time. The questions relating to sections 2 and 3 are alike

in some but different in other important respects, and the sections must be treated in this report separately.

"It appears that after the execution of the original contracts between the city and contractors on sections 2 and 3 of the north-west land tunnel, the city authorities made certain changes in the location and western terminal points of both sections, and this council has authorized the construction of pumping stations at the western terminals of sections 2 and 3, as located by the department of public works, and the same are now far advanced in process of construction. These and other changes have given rise to much of the difficulty between the city and the contractors.

"The first contention considered by the committee was that with Weir, McKechney & Co., the contractors on section 3. The nature of the differences, its effect on the work of construction, and our conclusions and report thereon, are as follows:

"1. We find that the firm of Weir, McKechney & Co., as city contractors, have been engaged in constructing section 3 of the north-west land tunnel for the city of Chicago under a contract dated October 19, 1895, and under a contract supplemental thereto, dated May 17, 1897.

"2. We further find that complicated litigation now exists between the contractors on said section 3 and the city, involving many disputed questions both of law and fact, and that this litigation cannot be settled in the courts, in the ordinary course of events, for years to come. In the meantime the capital already invested in the enterprise would be idle and useless and the people of the west side without water. In view of which fact we deem it important that some arrangement should be made by which work upon this section of the tunnel can be pushed to completion without waiting for the termination of the litigation, and which will protect both the city and the contractors in their rights as they may ultimately be decided in the lawsuits now pending, and to

that end we recommend that an arrangement be made with said contractors to at once proceed in the work of completing section 3 of said tunnel upon the following basis:

"*First*—Commissioner of public works to issue an estimate to Weir, McKechney & Co. for the work done and material furnished for said tunnel during the month of April, 1898, amounting to about $30,000.00, and that the comptroller pay the same.

"*Second*—That the comptroller pay to Weir, McKechney & Co. fifty per cent of the amount now held by the city under the fifteen per cent reservation clause in their contract.

"*Third*—That the city pay Weir, McKechney & Co. $2806.38 on account of expenses incurred in pumping water from the different shafts, to maintain the work in condition, from April 21, 1898, to May 23, 1898.

"*Fourth*—That the city pay Weir, McKechney & Co. the amount necessary to pump the water from the various shafts to prepare for the resumption of work.

"*Fifth*—That the commissioner of public works issue estimates, in regular form, twice each month for work which may hereafter be done, the city paying on such estimates only the cost of the expense of the work, and in no event paying more than the amount called for by such estimates.

"*Sixth*—That the pleadings in the pending suits between said contractors and the city be so changed as to cover and settle all controversies and matters at issue between the city and said contractors up to the time of the trial of said suits; and that said suits be advanced to a hearing at the earliest possible day, and that upon the hearing of said suits all questions in controversy shall be open for determination and decision without prejudice to either party by the making of the arrangement under which work is resumed and the making of any payment thereunder, so that the final judgment or

decree may be in accordance with the rights of the parties, upon the merits, as determined by the court, independent of such arrangement for the resumption of the work. In the final adjustment the city to receive credit for all moneys paid to said contractors on any account in connection with the construction of said section 3, and judgment to be rendered, if at all, against the city, for the balance due, and in the event that an over-payment shall be found to have been made, the city to be entitled to recover the amount of such over-payment."

The resolution hereinafter referred to, adopted by the city council on July 11, 1898, is as follows:

"*Resolved*, That the commissioner of public works be and he is hereby authorized, in making estimates for work done by Weir, McKechney & Co. on section 3 of the north-west land tunnel pending the settlement of the questions at issue between said contractors and the city, to allow said contractors, in addition to the lineal foot price where the tunnel is in earth, $6.00 per cubic yard for rock and for all material which shall be classified as rock; and where the tunnel is in earth or partly in earth and partly in rock, to allow said contractors $10.00 per cubic yard for all extra masonry directed to be placed between the upper quarters, outside of the regular specified rings of brick work of the tunnel and the crown bars or plank to protect the work, the making of said estimates in said manner and payments made thereon to be without prejudice to the rights of the city, and in nowise to affect the determination of the questions at issue between the city and said contractors."

The agreement of October 8, 1898, hereinafter referred to, is as follows:

"Articles of agreement made and entered into this eighth (8th) day of October, A. D. 1898, by and between the city of Chicago, the party of the first part, and Weir, McKechney & Co., the parties of the second part:

"*Witnesseth*, That whereas, the said parties of the second part entered into a contract with the city of Chicago dated October 19, 1895, and a contract supplemental thereto dated May 17, 1897, for constructing section 3 of the north-west land tunnel in the city of Chicago, and

subsequently entered upon the performance of the work covered by said contract; and whereas, during the progress of said work certain controversies in regard to the construction of the said contract and of the rights of the said parties of the second part thereunder arose, which led to the suspension of further work under said contract; and whereas, the committee on finance of the city council of the city of Chicago made a report recommending that an arrangement should be made with said contractors to at once proceed in the work of completing said section 3 of said tunnel on a basis set forth in the said report, accompanying which said report was also a resolution, the adoption of which was recommended by said committee; and whereas, said report and resolution were adopted by the city council of the city of Chicago on the 11th day of July, 1898, which said report and resolution are shown upon pages 562 to 566, inclusive, of the printed proceedings of said city council of date July 11, 1898; and whereas, the said parties of the second part accepted the arrangement so proposed and ratified on behalf of the city of Chicago and resumed work on said tunnel thereunder, and have received divers payments of money under said arrangement so authorized as aforesaid; and whereas, the said parties are desirous of evidencing the said arrangement by written agreement:

"Now, therefore, it is hereby mutually agreed between the parties hereto, as follows:

"*First*—That all work done by said parties of the second part upon said section 3 of said north-west land tunnel since the 11th day of July, 1898, has been done under and in performance of the arrangement authorized by said city council as hereinbefore stated, and that all payments made by the city of Chicago to said parties of the second part since said 11th day of July, 1898, have been made by the city of Chicago and received by the said parties of the second part under said arrangement so authorized by the city of Chicago,

"*Second*—That said parties of the second part agree to proceed and complete the work called for by their said contract under the said arrangement, it being agreed that the commissioner of public works shall issue estimates in the regular form twice each month for work that may be done hereafter, the city paying on such estimates only the cost of the expense of such work, and in no event paying more than the amount called for by such estimates; and that pending the settlement of the questions at issue between the parties hereto the said contractors in said estimates shall be allowed, in addition to the lineal foot price where the tunnel is in earth, $6.00 per cubic yard for rock and for all material which shall be classified as rock, and where the tunnel is in earth or partly in earth and partly in rock, said contractors shall be allowed $10.00 per cubic yard for all extra masonry directed to be placed between the upper quarters, outside of the regular specified rings of brick work of the tunnel and the crown bars or plank to protect the work; the making of said estimates in said manner and payments made thereon to be without prejudice to the rights of the city, and in nowise to affect the determination of the questions at issue between the city and the said contractors.

"*Third*—That the pleadings in the pending suits between the parties hereto shall be so changed as to cover and settle all controversies and matters at issue between the city and said contractors up to the time of the trial of said suits, and that said suits shall be advanced to a hearing at the earliest possible day, in accordance with resolutions passed by city council July 11, 1898, and that upon the hearing of said suits all questions in controversy shall be open for determination and decision without prejudice to either party by the making of the arrangement under which work has been resumed and the making of any payment thereunder, so that the final judgment or decree may be in accordance with the rights of the

205—26

parties upon the merits as determined by the court, independent of such arrangement for the resumption of work. In the final adjustment the city shall be entitled to receive credit for all moneys paid to said contractors, on any account, in connection with the construction of said section 3, judgment to be rendered, if at all, against the city for the balance due, and in the event an overpayment shall be found to have been made, the city to be entitled to recover the amount of such over-payment.

"In witness whereof the said city of Chicago has caused this agreement to be signed by its commissioner of public works, countersigned by its comptroller and approved by its mayor, and the said parties of the second part have hereunto set their hands and seals the day and year above written.

THE CITY OF CHICAGO,

Approved:     By L. E. McGANN, *Comr. of Public Works.*

CARTER H. HARRISON, *Mayor.*

| | | |
|---|---|---|
| | WEIR, McKECHNEY & Co., | [Seal.] |
| Countersigned, | FRED C. WEIR, | [Seal.] |
| R. A. WALLER, | JOHN McKECHNEY, | [Seal.] |
| *Comptroller.* | JOHN McKECHNEY, JR. | [Seal.]" |

The notice of forfeiture hereinafter referred to, and dated June 22, 1899, is as follows:

"To John McKechney and John McKechney, Jr., as surviving partners of the firm and co-partnership of Weir, McKechney & Co., Chicago, Illinois:

"Take notice, that whereas your firm and you have repeatedly violated the provisions of that certain contract and agreement heretofore made and entered into by and between said firm and the city of Chicago on, to-wit, the 19th day of October, A. D. 1895, for the construction by said firm of section three (3) of the north-west land tunnel, and that you are now continuing to violate the same; that as a part of such violation you have failed to proceed, and are now refusing and failing and omitting to proceed, with the work of constructing said tunnel in accordance with the requirements and conditions

of said contract and agreement; that the rate of progress heretofore made and being now made by said firm and you in the construction of said tunnel was not and is not, in my judgment, as rapid as it should be nor according to the requirements of said contract and agreement; that, whereas, in a portion of said tunnel the material is earth or clay, yet you have been, and were up to the 11th day of November, A. D. 1898, still excavating therein more than could be lined with masonry the same day, which was and is contrary to the provisions of said contract; that whereas, the contract and agreement provides that the excavation for the tunnel, when through firm clay, shall conform exactly to the outside of the masonry, and whereas, also, a portion of the excavation of the tunnel being constructed previous to November 11, 1898, was in such material, yet that nevertheless you have not made such excavation conform to the outside of the said masonry, as required by said contract and agreement; that in doing the work of constructing said tunnel you have been making excavations therefor a great deal larger than necessary, which is liable to cause injury to said tunnel when completed; that the methods of construction heretofore pursued by said firm and you have been extravagant, reckless and dangerous, thus greatly, unjustly and wrongfully increasing the cost of the tunnel to the city of Chicago, the practice of your firm and you having been to make unnecessary excavations, which have been and are required to be filled with expensive masonry and timbering, and which has been done by your firm and you against the protest and objections of the engineer in charge of the work and of the city engineer; and whereas, your said firm and you did, on or about the 11th day of November, A. D. 1898, in violation of said contract, abandon and discontinue the construction of said section three (3) of the said tunnel, and have allowed portions of the same to remain in a very dangerous condition, and thereby causing the said city of

Chicago great expense, solicitude and annoyance, and you have also refused and omitted to protect the unfinished portions of said tunnel, so that great injury has been thereby caused to it and also to the buildings of certain citizens of Chicago upon the surface of the earth over said tunnel, and that you have unnecessarily, maliciously and wrongfully, and in violation of said contract, delayed the construction of said tunnel greatly beyond the time provided for its completion in and by the provisions of the said contract; and whereas, your firm and you have also violated and are violating the said contract and agreement in other respects:

"Therefore, I, as commissioner of public works of the city of Chicago, do hereby and now, and from the delivery of this notice to you, declare the said contract and agreement forfeited as to the whole of said work provided to be done by the terms of said contract and agreement and yet unfinished, and you are ordered and directed to at once discontinue all work upon said tunnel and to at once remove all of your property therefrom.

Chicago, June 22, A. D. 1899.    L. E. McGANN,
Comr. of Public Works of City of Chicago."

CHARLES M. WALKER, Corporation Counsel, THOMAS J. SUTHERLAND, and JAMES E. MUNROE, for appellant.

PECK, MILLER & STARR, and L. D. CONDEE, for appellees.

Mr. JUSTICE MAGRUDER delivered the following opinion:

The contractors, Weir, McKechney & Co., began work under the contract of October 19, 1895, in December of that year. They first sank a shaft at Keith street, northwest of the south-east end of section 3. Their next work was to sink a shaft at Potomac avenue north-west from the Keith street shaft. After sinking these shafts they began to excavate for the tunnel both ways from the

two shafts.   They continued the work until August 1, 1896, and then stopped work.  From the time they began their work in December, 1895, until they ceased working in July, 1896, the city paid them $39,574.81.  These payments were made in various sums, all the payments except the first two being made at the rate of two per month upon certified estimates, signed by the proper city officials.   Upon these estimates are endorsed written receipts for the amounts so paid to them, signed by Weir, McKechney & Co., amounting altogether to the total sum above named.

When the contractors, Weir, McKechney & Co., ceased work on August 1, 1896, they at once began a suit against the city.  This suit grew out of differences of opinion between the city and the contractors as to the proper construction of certain provisions of the contract of October 19, 1895.  This suit was begun in the circuit court of Cook county, and resulted in a judgment in favor of the plaintiffs therein on September 14, 1896.  An appeal was taken from such judgment to the Appellate Court, and on December 31, 1896, the Appellate Court entered a judgment. (*Weir* v. *City of Chicago*, 67 Ill. App. 247).   An appeal was taken from the judgment of the Appellate Court to this court, and the decision of this court, embodied in an opinion filed on March 12, 1897, is reported as *City of Chicago* v. *Weir*, 165 Ill. 582.  During the pendency of this litigation from August, 1896, to the final termination thereof on March 12, 1897, very little work was done by the contractors in the construction of the tunnel; but they resumed work on November 14, 1896, in view of a threat by the commissioner of public works to cancel the contract, and, during this period, six payments were made to them, two in December, 1896, three in February, 1897, and one on March 1, 1897, amounting altogether to $12,591.40. Substantially all of the payments thus made to the contractors during the period between August, 1896, and March, 1897, were receipted for under protest.

Work was resumed in March, 1897, and between March 20, 1897, and December 1, 1897, and including those dates, the city paid to the contractors, Weir, McKechney & Co., the sum of $283,094.86 upon certified estimates. The said sum of $283,094.86 was paid out to Weir, McKechney & Co. in various amounts, the payments being made twice in each month during that period; and sometimes three payments were made in one month. Upon the certified estimates are endorsed written receipts, signed by Weir, McKechney & Co., for the amounts of such payments.

At this point, and on December 8, 1897, the contractors began this present suit against the city. Before proceeding to state the substance of the pleadings in the present action, it may be remarked that the contractors proceeded with the work of construction, and the city continued to make payments to the contractors, such payments being for the most part semi-monthly payments, until about the 21st of April, 1898, when the contractors again abandoned their work upon the tunnel. They did not resume work until about July 11, 1898, at the time of the proceedings by the common council of Chicago, set forth in the statement preceding this opinion. About July 11, 1898, work was again resumed and continued with more or less regularity until November 11, 1898, when the contractors abandoned the work altogether, and never have since resumed it. The work of constructing the tunnel was unfinished on November 11, 1898, when the contractors finally abandoned it. Between the time when this suit was begun, and November 11, 1898, when the work was finally abandoned, the city paid to the contractors various sums of money, amounting altogether to the sum of $283,455.59. The payments, constituting this total amount, were made between December 16, 1897, and November 1, 1898, including those dates, upon certified estimates, and for the most part at the rate of two payments in each month. These payments were duly receipted for without protest by the

contractors, in writing, endorsed upon the estimates. The total amount paid to the contractors by the city between December 31, 1895, about the time when the construction of the tunnel began, and November 11, 1898, when the same was abandoned, was the sum of $618,-716.66. This sum, and the judgment rendered in this case for $555,560.22, amount to $1,174,276.88.

Besides the suit begun in August, 1896, and the present suit begun on December 8, 1897, the contractors during the progress of the work brought at least three injunction suits against the city. The first injunction suit was brought by them against the city in March, 1898. In the beginning of that month the city engineer gave the contractors a written direction to raise the grade in certain drifts, and, although the specifications provided that the tunnel should be built on such grades as should be determined by the city engineer, they refused to obey the order, and procured an injunction from the Superior Court of Cook county restraining the city from enforcing the order. This injunction was subsequently dissolved. The second injunction suit, brought by the contractors against the city, was commenced on April 30, 1898. At that time the city engineer wrote a letter to the contractors, ordering them to brick up certain portions of the excavation in certain drifts of the tunnel, there being danger at those points that the tunnel would cave in. This order was not complied with, but the contractors obtained an injunction against the city from interfering with the work. This injunction was in force when the council proceedings of July 11, 1898, were had. At the time of the last suspension of the work on or about November 11, 1898, the contractors filed a third bill for an injunction against the city. By this third bill they sought to prevent the city, through an injunction, from seizing the tunnel and machinery and forfeiting the contract. This last injunction was finally dissolved on June 16, 1899, one week before the beginning of the trial of this case; and on

June 23, 1899, the day on which the trial began, the commissioner of public works served upon the contractors the notice of forfeiture of the contract of October 19, 1895, as the same is set forth in the statement preceding this opinion.

*First—The pleadings.* In order to understand the present case, and the various points involved in the record, it will be necessary to state somewhat in full the very extraordinary condition of the pleadings in the case.

When the suit was brought on December 8, 1897, the *ad damnum* was laid at $68,000.00. On January 7, 1898, a declaration was filed. On March 5, 1898, a demurrer was filed to this declaration, and, after argument, was overruled, and the plaintiffs were given leave to increase the *ad damnum* to $125,000.00. On November 28, 1898, the plaintiffs were granted leave to amend their declaration instanter by increasing the *ad damnum* to the sum of $650,000.00, and to file their bill of particulars instanter, which they did. The sum total of the bill of particulars, so filed on November 28, 1898, is $620,833.18. On November 30, 1898, it appearing that the declaration, which had been filed on January 7, 1898, had been lost, the court granted leave to the plaintiffs to file an amended declaration, which was substituted for the former declaration and filed on November 30, 1898. The declaration of November 30, 1898, consisted of five counts and the common counts. The first count alleged that the defendant was indebted to the plaintiffs in the sum of $650,000.00 for work and materials furnished for the construction of the tunnel, known as section 3 of the north-west land tunnel. The second count was substantially the same as the first. The third count alleged that, on October 19, 1895, an agreement was made between the plaintiffs and the city, that the former should build the water tunnel according to the terms, conditions and specifications set forth in said contract, and that the defendant should direct the construction thereof, and alleged that said contract of

October 19, 1895, was afterwards, on May 17, 1897, and on October 8, 1898, amended, modified and changed by agreement, and that defendant was to pay plaintiffs according to a schedule of prices set forth in said contract and the modifications thereof, the payments to be made from time to time as the work progressed; that the city promised to fulfill said contract and the modifications thereof, but that the city refused to pay plaintiffs for their work and materials furnished in the construction of the tunnel. The fourth count also declared upon the contract of October 19, 1895, and the alleged modifications made therein by the contracts of May 17, 1897, and October 8, 1898, and alleged that the defendant promised to fulfill said contract and the modifications thereof, but that defendant did not direct plaintiffs to construct the tunnel at the grade, or on the line, prescribed by said contracts, but required and compelled them to construct the tunnel at a different grade and in a different direction from the grade and direction provided for in and by said contracts, whereby the cost of the work was greatly and unnecessarily and unreasonably increased, and plaintiffs were compelled to expend large sums of money, to-wit, the sum of $3000.00 as compensation for injuries to the property of third persons. The fifth count also declared specially upon the contract of October 19, 1895, and the alleged supplemental contracts or modifications of May 17, 1897, and October 8, 1898, and avers that defendant did not perform said contract in that it did not properly direct the construction of the tunnel, but gave plaintiffs unreasonable, erroneous, incorrect and contradictory directions in regard to the same, whereby the cost was unreasonably and unnecessarily increased. Demurrers filed by the city to these five counts were overruled as to the first and second and common counts, and sustained as to the third, fourth and fifth counts.

On March 11, 1898, appellant had filed to the original declaration of January 7, 1898, which was subsequently

lost, four pleas, including the general issue sworn to, and a plea of set-off, with a copy of account and bill of particulars accompanying the same. These pleas were lost, together with the declaration, and, by stipulation between the parties, copies of such pleas so filed on March 11, 1898, were re-filed in said cause as substitutes for, and in place of, said original pleas and of said original bill of particulars and copy of account. The second plea so filed by the city on March 11, 1898, and a copy of which was subsequently re-filed as a substitute for the lost original thereof, averred that the contract of October 19, 1895, together with the specifications attached thereto, was executed by the plaintiffs and the city; and further averred that no other or different contract, agreement, undertaking or promise than as contained in said contract of October 19, 1895, with the specifications attached, was ever made by the city with the plaintiffs, or either of them, and that the promises set forth in the several counts of the declaration were those contained in said contract of October 19, 1895, and not otherwise, and that at the several times so named the defendant had not, by its city council or otherwise, made any appropriation of moneys for the payment of the several sums so promised to be paid, etc.

The third plea, so filed by the city, alleged that, at the time of the making of said contract of October 19, 1895, and of the promises alleged in the declaration, the city was indebted, in the aggregate, exceeding five per centum on the value of the taxable property therein, and within its limits, as ascertained by the last assessment for State and county taxes, etc. The fourth plea was a plea of set-off, alleging that plaintiffs were indebted to the city in the sum of $540,000.00 for money before that time lent, paid, laid out and expended, etc., and also for moneys before that time unlawfully paid to the plaintiffs by the agents and officials of the defendant, and without any authority from the defendant, and for over-payments

of moneys of the city unlawfully before that time made to the plaintiffs at their request by the agents and officials of the city and without authority, and also for moneys before that time due to the city from the plaintiffs by reason of the delays of the plaintiffs in doing the work provided to be done by them in and by said contract of October 19, 1895, which sums of money, so due from the plaintiffs to the city, were alleged to exceed the damages sustained by the plaintiffs, etc.

The copy of the account or bill of particulars, attached to said fourth plea, or plea of set-off, set forth alleged unlawful and over-payments to said firm of Weir, McKechney & Co. for alleged and pretended rock excavation in tunnel, part earth and part rock, and in all earth, at $6.00 per cubic yard, said payments amounting to $101,836.74, and having been made at various dates and in various sums between March 23, 1897, and November 1, 1897, inclusive of both of said dates. Said bill of particulars or copy of account also set forth alleged unlawful payments to said firm for back masonry at $10.00 per cubic yard, amounting altogether to $102,959.00, and having been made at various dates and in various sums between June 3, 1897, and November 1, 1898, including both of those dates. Each over-payment for such excavation and back masonry is referred to in said bill of particulars as being contained in the various estimates made by the city and shown by the record. Other items are set forth in said bill of particulars, amounting altogether to $195,841.18, being for alleged unlawful payments for back masonry at $10.00 per cubic yard; and for timber unnecessarily used in certain drifts and one of the shafts of the tunnel at $10.00 per thousand feet, amounting altogether to $21,145.81; and also certain payments alleged to have been made to employes of said firm, and for pumping and maintenance and out of the reserve of fifteen per cent, etc., amounting altogether to $64,002.51; and also certain other alleged unlawful pay-

ments on account of rock excavation and amounts due as liquidated and fixed sums for delay in completion of section 3 of the tunnel under the contract at $200.00 per day, amounting altogether to $110,692.86. The total items of set-off shown by the bill of particulars, attached to the plea of set-off, filed as a substitute for the plea of March 11, 1898, amount to $400,636.92. The first of the four pleas above named was the plea of general issue, and attached to the same was an affidavit of the corporation counsel of the city, that the said plea and all the statements therein were true in substance and in fact.

On December 2, 1898, the plaintiffs below were given leave to file an additional count to their amended and supplied declaration, which had been filed on November 30, 1898. Accordingly, on December 2, 1898, the plaintiffs below filed the first additional count to their declaration. This count set forth *in hæc verba* the contract of October 19, 1895, together with all the specifications thereto attached; also the alleged contract of May 17, 1897, unsigned by the city, and the contract of October 8, 1898, all of which are set forth in the statement preceding this opinion. After setting forth the instruments last above referred to, the first additional count alleges that, in consideration thereof, and of the promises of the plaintiffs to construct said tunnel, the city promised the plaintiffs to perform said three contracts, but avers that the city has not done so, but refuses to pay plaintiffs for their work and materials, done and furnished in the construction of the said tunnel, to the damage of the plaintiffs of $650,000.00, for wages, materials, machinery and other disbursements, etc. Said first additional count also alleges, that the city did not direct plaintiffs to construct the tunnel at the grade or on the line described in the contract of October 19, 1895, but directed and compelled plaintiffs to construct said tunnel at a different grade, to-wit, at a grade higher than that provided for in the contract, and in a different direction from that provided

for in the contract, whereby the cost of the work was greatly increased, etc.; and it also alleged in said count that the city did not properly direct the construction of the tunnel, as required by the contract of October 19, 1895, but gave plaintiffs unreasonable and erroneous directions in regard to the same, etc. The city demurred to the first additional count, so filed on December 2, 1898; and this demurrer was sustained. Thereupon, plaintiffs were given leave to file two additional counts to the declaration, known as the second additional count and the third additional count, which were so filed on December 21, 1898.

The second additional count averred the execution of the agreement of October 19, 1895, referring to the same as set out in full in the first additional count above referred to, and further averred that plaintiffs performed work upon the tunnel pursuant to the same under the direction of the commissioner of public works of the city, and to his satisfaction and approval; that, according to a prevailing custom, the city should have made estimates, every two weeks, of the amount of work done by the plaintiffs according to the prices fixed by the contract; that, by said contract, it was agreed that, if the rate of progress should be satisfactory to said commissioner, estimates in the usual form would be issued to the contractors, during the construction, for eighty-five per cent of the value of the work done and in place at the time of issuing the same, the remaining fifteen per cent being reserved until the final completion of the work; that plaintiffs did the work, and the rate of progress was at all times satisfactory to the commissioner, but the defendant did not and would not estimate every two weeks in the usual form for eighty-five per cent of the value of the work done, and did not and would not pay to plaintiffs eighty-five per cent of such value; that there was due to the plaintiffs prior to May 17, 1897, a large sum of money, to-wit, $300,000.00, which the city

refused to pay to them. The second additional count then proceeds to aver that a further contract was made on May 17, 1897, as set forth in the first additional count; that plaintiffs proceeded with the work in accordance with the terms of said contract of October 19, 1895, as modified by the contract of May 17, 1897, and that, after the making of the latter contract, estimates for the work done should have been made every two weeks in accordance with said contract and the custom aforesaid; that plaintiffs were entitled to receive payment for said work in accordance with the terms of the original contract of October 19, 1895, as modified and supplemented by the contract of May 17, 1897; that the city did not pay the plaintiffs eighty-five per cent of the value of the work, and would not allow and pay to plaintiffs for the materials encountered, that should be classified as rock, at the rate fixed in the contract of May 17, 1897, and would not allow plaintiffs for the extra masonry placed between the upper quarters outside the regular specified rings of brick work of the tunnel and the crown bars or planks to protect the work, as provided in the contract of May 17, 1897; that there was due to plaintiffs, prior to July 11, 1898, under said two contracts, large sums of money, to-wit, $300,000.00, which the city refused and still refuses to pay; that, prior to July 11, 1898, certain differences arose between plaintiffs and the city, and on or about June 28, 1898, plaintiffs addressed to the mayor of the city a proposition, dated June 28, 1898, which is set forth in the statement preceding this opinion, and which said second additional count also set forth *in hæc verba.* The second additional count further avers that, on or about July 11, 1898, the city council adopted a certain resolution, which is set forth *in hæc verba* in the count, and a copy of which is also set forth in the statement preceding this opinion. The second additional count then avers that such resolution was approved by the mayor, and that, in accordance with said proposition of plain-

tiffs, and said resolution, plaintiffs proceeded with the
construction of the tunnel, and on October 8, 1898, there
was executed by the plaintiffs and the city a contract
dated October 8, 1898, which is set forth in the statement
preceding this opinion, and which is referred to in the
count as being set out in said first additional count; that,
after July 11, 1898, and after the execution of the con-
tract of October 8, 1898, plaintiffs proceeded to carry
on the work, called for by the original contract, and by
the supplemental contract of May 17, 1897, in accordance
with the terms thereof, and in pursuance of the arrange-
ments made by the letter of the plaintiffs to the mayor
and said resolution of July 11, 1898, and under the terms
of the contract of October 8, 1898; that it was the duty
of the commissioner of public works to issue estimates
twice each month for work done, and to pay on such
estimates the cost of the expense of such work, and to
allow, in addition to the lineal foot price where the tun-
nel was in earth, $6.00 per cubic yard for rock and for all
material, which should be classified as rock, and where
the tunnel was in earth, or partly in earth and partly in
rock, it became the duty of the city to allow plaintiffs
$10.00 per cubic yard for the extra masonry, directed to
be placed between the upper quarters outside the regu-
lar specified rings of brick work of the tunnel and the
crown bars or planks to protect the work; that plaintiffs
laid out large sums of money for material and labor, and
the city would not issue estimates to them, nor pay on
said estimates the costs and expenses incurred by them,
and did not allow to said plaintiffs, in addition to the
lineal foot price, the $6.00 per cubic yard, and the $10.00
per cubic yard, above mentioned; that after July 11, 1898,
large sums of money became due to plaintiffs for rock,
and material classified as rock, excavated, and for extra
masonry placed as above specified, to-wit, the sum of
$300,000.00, which the city refuses to pay plaintiffs to
their damage of $650,000.00,

The third additional count, so filed on December 21, 1898, makes substantially the same averments as the second additional count, and sets forth, and refers to, the same instruments in writing and alleged contracts. The third additional count avers that said contract of October 8, 1898, upon its execution, immediately became a part of the agreement between the plaintiffs and the defendant for the construction of said tunnel; that the city promised to give plaintiffs proper and reasonable directions for the construction thereof, on a line within the area shown as colored on a certain map made by the officers of the city and attached to the original contract, and at such a grade that the depth of the center line of said tunnel should be approximately between seventy-five and eighty-five feet below Chicago city datum, the plaintiffs being required by said contract to obey such directions; that the city also promised that it would issue estimates twice every month for eighty-five per cent of the value of the work done as above stated, and would pay such estimates upon their presentation to the comptroller, and would allow to plaintiffs for timbers and boards, used in supporting the soil in the excavation, and left permanently in the work, at the rate of $10.00 per thousand feet board measure, and would allow plaintiffs for excavation, etc., at the rate of $6.00 per cubic yard as above stated, and also $10.00 per cubic yard for extra masonry as above stated; that plaintiffs have in all things performed said three contracts, yet the city did not give them reasonable directions, but gave them unreasonable and contradictory directions, whereby the cost of the work was unnecessarily and unreasonably increased, to-wit, in the sum of $300,000.00, without any corresponding increase in the compensation of plaintiffs therefor; that the city did not direct the tunnel to be run at the grade, or on the line, required by the contracts, but required plaintiffs to construct the same on a line outside the area above mentioned, and with a grade much

higher than that described in the contracts, to-wit, at a grade of but sixty-five feet below Chicago city datum, whereby the cost of the work was greatly increased in the sum above named, and whereby plaintiffs expended large sums of money, as compensation for injuries to the property of third persons, caused by constructing the tunnel at such changed grade; that the city did not issue estimates twice every month for eighty-five per cent of the value as above specified, and did not pay plaintiffs the cost of the expense of the work, and did not allow them the $6.00 per cubic yard for excavation and $10.00 per cubic yard for extra masonry as above set forth, and did not allow them $10.00 per thousand feet board measure for the timbers used in supporting the soil, and left permanently in the work; that, in carrying on the work, the plaintiffs paid out large amounts of money, to-wit, $500,-000.00, for material and labor; that there is now due to them from the city, under the contract of October 19, 1895, and the confirmatory contracts of May 17, 1897, and October 8, 1898, a large sum of money for work done, etc., to-wit, $650,000.00, which the city refuses to pay. Demurrer was filed by the city to the second and third additional counts of the amended declaration, and was overruled.

On March 10, 1899, the death of Frederick C. Weir was suggested, as above stated, and the cause proceeded at the suit of the present appellees.

On April 1, 1899, the city filed four pleas to the second and third additional counts of the plaintiffs as above set forth. The first of these pleas was the general issue, sworn to. The second plea alleged the execution of the contract of October 19, 1895, and averred that it constituted the only promise and undertaking of the city, as charged in the declaration, and that no other or different contract, agreement, undertaking or promise than as contained in said contract of October 19, 1895, in writing, with said specifications attached, was ever made by the

city with the plaintiffs or any or either of them, and that all the promises set forth in the several counts of the declaration of the plaintiffs are those contained in said contract of October 19, 1895, and not otherwise. This plea also sets up that the city council did not make any appropriation of moneys for the payment of the sums so promised to be paid as aforesaid. The third plea is the same as the third plea already set forth, alleging that, at the time of the execution of the contract of October 19, 1895, the city was indebted in the aggregate exceeding five per cent of the value of the taxable property, etc. The fourth plea was a plea of set-off, alleging the indebtedness of the plaintiffs to the city in the sum of $540,000.00, and alleging over-payments by the city to the plaintiffs, unlawfully made, as alleged in the plea of set-off already described. On April 7, 1899, the plaintiffs filed a *similiter* to the plea of the general issue, and demurred to the second, third, and fourth pleas, filed by the city.

Subsequently, on May 25, 1899, the plaintiffs filed two replications to the second plea of the city. The first replication, in reply to the statement that the city had not made any appropriation, etc., set up the proceedings in the suit begun in August, 1896, and the judgments therein by the trial court, the Appellate Court and the Supreme Court as *res judicata.* The second replication sets up that the city of its own wrong broke the promises in the declaration mentioned. The plaintiffs also filed two replications to the third plea. In the first replication, as to the statement that the city was indebted in the aggregate exceeding five per cent, the proceedings and judgments in the suit begun in August, 1896, are pleaded as *res judicata.* The second replication to the third plea merely avers that the city of its own wrong, etc., broke the promises in the declaration and each count thereof mentioned. On June 23, 1899, the city filed a rejoinder to the first replication to the second plea, which was in-

effect a plea of *nul tiel record*, as to the judgments mentioned in the plea. The city also filed a rejoinder to the first replication to the third plea, which was also in substance a plea of *nul tiel record*. The city also filed a second rejoinder to the first replication to the second plea, setting up that the contract referred to in the suit begun in August, 1896, was not the same contract as that upon which the present suit is brought, but was another and different contract. The second rejoinder filed by the city to the first replication of plaintiffs to the third plea is substantially the same as the second rejoinder to the first replication to the second plea.

On May 26, 1899, the cause was set down for trial for Monday, June 19, 1899. Subsequently, the city asked and obtained leave to withdraw its third plea, filed on April 1, 1899.

On June 23, 1899, the trial of the cause commenced, and the jury was empaneled.

On July 3, 1899, during the trial and on the eleventh day after the trial had begun, an order was entered, on the motion of the attorneys of the plaintiffs, permitting all papers and proceedings to be amended by increasing the *ad damnum* to $1,000,000.00, and, on like motion, the plaintiffs were given leave to file additional counts instanter, and to file an additional bill of particulars instanter; and it was ordered that said additional counts and additional bill of particulars be filed *nunc pro tunc* as of June 23, 1899. Accordingly, two additional counts, known as the fourth and fifth additional counts, were filed to the plaintiffs' declaration on July 3, 1899, *nunc pro tunc* as of June 23, 1899, entitled in the cause of John McKechney and John McKechney, Jr., as surviving partners of Frederick C. Weir, John McKechney and John McKechney, Jr., against the city of Chicago. At the same time, to-wit: July 3, 1899, the plaintiffs were permitted to file *nunc pro tunc* as of June 23, 1899, an additional bill of particulars, the sum total of items therein

being $830,340.29. Subsequently on July 8, 1899, plaintiffs were permitted to file an additional bill of particulars, the items in which amounted altogether to $19,118.95, and subsequently on July 13, 1899, plaintiffs were permitted to file another bill of particulars amounting to $63,155.05, including the $19,118.95 already mentioned.

The fourth additional count filed by the plaintiffs on July 3, 1899, *nunc pro tunc* as of June 23, 1899, sets up the execution of the contract of October 19, 1895, the beginning of the work thereunder under the direction of the commissioner of public works of the city, etc., and avers that such work was done to the entire satisfaction of said commissioner, and, after setting up the provisions of the contract as to estimates, and the alleged custom as to the giving of such estimates every month, and the alleged execution of the contract of May 17, 1897, and after setting forth said letter of June 28, 1898, to the mayor, and the resolution of the city council passed on July 11, 1898, and after further setting up the making of the alleged contract of October 8, 1898, and the making of the promises by the city to give plaintiffs proper directions for the construction of the tunnel on a certain line within the area shown on a certain map made by officers of the city, and at such a grade that the depth of the center line of said tunnel should be approximately between seventy-five and eighty-five feet below Chicago city datum, and to issue estimates to the plaintiffs twice every month for eighty-five per cent of the value of the work, and to pay such estimates upon presentation to the city comptroller, and to allow plaintiffs for the timbers and boards used as above stated at the rate of $10.00 per thousand feet; and after further setting up the alleged promises of the city to allow plaintiffs for all materials encountered in earth tunnel that was rock, or of such a nature as to be classified as rock, at the rate of $6.00 per cubic yard, in addition to the lineal foot provided for by said original contract; and after further set-

ting up that, by the contract of October 8, 1898, and said resolution, the city agreed to allow the plaintiffs, where the tunnel was in earth or partly in earth and partly in rock, $10.00 per cubic yard for all extra masonry directed to be placed between the upper quarters outside of the regular specified rings of brick work of the tunnel, and the crown bars or planks to protect the work; and after further alleging that plaintiffs always performed said three contracts on their part, the count then charges that the city did not give the plaintiffs proper or reasonable directions for the construction of the tunnel, but gave unreasonable, erroneous, incorrect and contradictory directions whereby the cost of the work was greatly increased, to-wit, in the sum of $300,000.00, without any corresponding increase in plaintiff's compensation therefor; that defendant did not direct the tunnel to be run at the grade or on the line required by said contract, but required it to be constructed on a different line and with a higher grade, to-wit, at a grade of but sixty-five feet below Chicago city datum, whereby the cost was greatly increased, to-wit, in the sum of $500,000.00, etc.; and it is therein further alleged that defendant did not issue estimates twice every month for eighty-five per cent of the value, etc., and did not allow the price of $6.00 per cubic yard for excavation, and $10.00 per cubic yard for back masonry, as above alleged, and did not allow $10.00 per thousand feet board measure for timbers and boards used as aforesaid; and it is charged that plaintiffs laid out large amounts of money, to-wit, $500,000.00, for material and labor.

The fourth additional count, after making the averments above stated, which are substantially the same as those made in the second and third additional counts, then proceeds to make additional allegations not contained in any previous count, and constituting new issues, not theretofore formed or made in the case. The additional allegations, thus incorporated into the decla-

ration by the fourth additional count during the trial of the cause, and after more than half of the time of such trial had passed, were substantially as follows: that the city issued to the plaintiffs certain pretended estimates, which were incorrect and purported to certify the value of the work at amounts less than the actual value of the work done and materials furnished.   The fourth additional count then proceeds to aver as follows: "That the said mistaken and erroneous estimates, so furnished and issued by the said city, were so issued by the mistake and fraud and fraudulent purposes and acts of the officers of said city, and for the fraudulent and wrongful purpose of depriving plaintiffs of the compensation to which they were justly entitled under the said contract and supplemental contract, and proposition and resolution, and for the purpose of making the said contracts and the rights and obligations of plaintiffs thereunder, as hereinbefore stated, so burdensome and unprofitable as, if possible, to induce and compel these plaintiffs to abandon the same."   It is further averred in said fourth additional count that the city sometimes required extra work to be done, and ordered work to be done and materials to be furnished, which were in the nature of extra work, and sometimes gave written orders therefor, and sometimes required such extra work to be done without giving written orders therefor.   The count then makes the following allegation: "That said original contract was so modified that the said supplemental agreement, proposition, resolution and stipulation were, by the mutual agreement and consent of the parties, substituted for and accepted and adopted as the written orders for extra work required by the provision in the original contract, requiring that 'no payment will be made for any extra work not specified' in this contract, unless such extra work shall have been done by the written order of the commissioner of public works, to be attached to such contract, directing the same, and stating that such work

is not included in the contract, what extras are, and that such extras are necessary to the proper completion or for the security of the work previously done, and the reasons therefor,' and that said requirements of said original contract, in respect to written orders for extra work, were, by the mutual agreement of the parties, and by the acts of the parties, and by the acts of the defendant, in ordering and requiring such extra work to be done and issuing estimates therefor, and making payments therefor, waived and abandoned." The count then further proceeds to allege "that after the making of said contract of October 19, 1895, to-wit, on the first day of December, 1895, the defendant waived the provision and requirement of said contract of October 19, 1895, that the contractor must deliver to the commissioner of public works on or before the tenth day of each month, a written statement of amount of claims for extra work done and extra materials furnished during the previous month, or for extra expenses incurred from any cause whatever, otherwise claims for extras during the month would be forfeited and waived; and waived each and every part thereof; and that thereafter and after the tenth day of each month, to-wit, on the eleventh day of each month thereafter, thence hitherto, the defendant and the commissioner of public works accepted and received written statements of the amount of claims, and also oral statements of other claims for extra work done and extra materials furnished during the previous month, and for extra expenses incurred, with like effect as if such statements for each month were written statements and were delivered to the commissioner of public works on or before the tenth day of the succeeding month," etc. The count then proceeds to set up the fact, that the city maintained water-works and a water system under the statutes of the State, and collected water rates or rents for water furnished by it, and kept the income therefrom in a separate fund known as the water fund; that the con-

tracts for the construction of water tunnels have been silent since 1872 as to the fund from which payments therefor were to be made, and payments on such contracts have been made from said water fund, and, up to the time of making the tunnel contract herein, no express appropriation of money from said water fund was ever made to pay for the construction of any of the water tunnels which were a part of said water-works or system; that the moneys provided to be paid to plaintiffs by said original and supplemental contracts, proposition, resolution and stipulation were payable out of, and understood to be payable out of said water fund. The count further avers that the issue of said estimates and the making of said payments were necessary in order to enable plaintiffs to complete the work within the time contemplated by the contract; that the performance thereof was made a condition precedent to the performance by plaintiffs of the things on their part to be performed. The count then charges that the city withheld said estimates and payments and refused to make same, and made such fraudulent and false estimates as aforesaid for the purpose of making the performance of said contract, as so modified, so burdensome, injurious and disastrous to these plaintiffs as would make it impossible for these plaintiffs to perform the same and induce them to abandon the contract. The count then averred that plaintiffs have not abandoned the contract and are in possession of the work, and insist upon the performance of the contract by the city as modified; "that by reason of the said wrongful, fraudulent and mistaken acts and misconduct of the defendant, its officers and agents as aforesaid, these plaintiffs have been prevented from completing the performance of said work and finishing the said tunnel within the time contemplated by said contract, and the city of Chicago is solely responsible for the noncompletion of said work;" that, by reason of said wrongful misconduct, the machinery of plaintiffs has been tied

up, and they have been prevented from completing the work with the same, and entering upon other work, and have been deprived of the use of their plant in other work; that the city "in further pursuance of said wrongful and fraudulent purpose, has seized upon certain of said plants and machinery and taken and appropriated the same and carried off, and deprived the plaintiffs of the possession thereof, to the damage of the plaintiffs in the sum of, to-wit, $75,000.00." The count further alleges that defendant did not and would not perform the said three contracts, "but on the contrary said defendant willfully, wrongfully, fraudulently, capriciously, arbitrarily, unreasonably and without any reason or cause, and contrary to the provisions of said contracts and each of them, on, to-wit, the 23d of June, A. D. 1899, at, to-wit, the county of Cook aforesaid, assumed to declare said contracts and each of them, rescinded and forfeited, and assumed to declare and did declare the rights of these plaintiffs under said contracts, and each of them, then and there terminated, and in a like manner assumed to and did notify plaintiffs that the said contracts were then and there ended, rescinded, forfeited, terminated and abandoned, and then and there abandoned and refused to perform said contracts and each of them," etc.; that the city put an end to the further performance thereof by the plaintiffs and notified them to surrender possession of the work and the tunnel, attaching said notice of forfeiture to the count as "Exhibit A," the said notice being the same as that which is set forth in full in the statement preceding this opinion. The count then averred that the city wrongfully seized and took possession of the machinery, plant, tools, fixtures, equipments and property of the plaintiffs used by them in carrying on said work, which were of great value, to-wit, of the value of $100,000.00; that plaintiffs were willing and offered to continue in the performance of the work, and to complete the same, and have ever since been willing to perform

the same, but the city wrongfully, arbitrarily and without cause refused to permit plaintiffs to continue to perform the work and on June 23, 1899, prevented plaintiffs from proceeding to complete the work, and hindered and prevented them from so doing, "whereby the said plaintiffs have lost and have been deprived of the earnings, considerations and moneys which would have accrued to and become due unto these plaintiffs from said defendant, by their further performance and completion of their said work, and their said agreements, and undertakings, and whereby the plaintiffs have lost and have been deprived of the profits and advantages, which they otherwise would have derived and acquired from the completion of said work and performance of said contracts and the promises on their part to be performed, which earnings, considerations, moneys, profits and advantages then and there amounted to a large sum of money, to-wit, $650,000.00." The count further avers that, by reason of the wrongful repudiation of said contracts by the city and its wrongful acts in assuming to forfeit the same and in discharging the plaintiffs from further performance thereof and preventing them from further performing the same, and seizing said work, and depriving them of the possession thereof, the right of the said defendant to retain the remaining fifteen per cent of the amount earned and to be earned, was terminated; that the defendant still retains said fifteen per cent, and that the same is due and payable unto plaintiffs, but defendants refuse to pay the same; that, by reason of the conduct of the city, said tools, plant, machinery, fixtures and equipment have become of no value to the plaintiffs and utterly lost to them, whereby they have suffered damage in the sum of $250,000.00; and that there is due to them from the city on account of the non-performance of said contract a large sum of money, to-wit, $650,000.00, being the amount of damage by reason of the wrongful termination, abandonment and forfeiture of the contracts, and

prevention of plaintiffs from completing the same, and by reason of the premises the city became indebted to the plaintiffs in the sum of $1,000,000.00.

The fifth additional count to the declaration makes the same allegations as the fourth additional count, except that it goes into more detail, giving figures and amounts as set up in the itemized bill of particulars filed with the declaration. It sets up the same allegations in regard to the refusal to give estimates, to pay the amounts mentioned in the alleged supplemental contract, and also charges the giving of fraudulent and pretended estimates. It also sets up "that said original contract was so modified that said supplemental agreement, proposition, resolution and stipulation were by the mutual agreement and consent of the parties substituted for and accepted and adopted as the written orders for extra work required by the provisions in the original contract," as above set forth. It also alleges that said requirements of said original contract in respect to written orders for extra work were by the mutual agreement and by the acts of the parties, and by the acts of the defendant, etc., waived and abandoned. It contains the same allegations in regard to waiver of the provision as to the delivery to the commissioner of public works, on or before the tenth day of each month, of a written statement of amount of claims for extra work, as are contained in the fourth additional count. It also adds that the city refused to make said estimates and payments as aforesaid, but made such mistaken, improper, fraudulent and false estimates for the said fraudulent purpose of making the performance of said contract, as so modified, so burdensome, injurious, unprofitable and disastrous to plaintiffs as would make it impossible for plaintiffs to perform the same and as would induce plaintiffs to abandon said contract. It further alleges "that by reason of the said wrongful, fraudulent and mistaken acts and misconduct of the defendant, plaintiffs have been prevented

from completing the performance of said work and finishing said tunnel within the time contemplated by said contract," and that "said city of Chicago, in pursuance of said wrongful and fraudulent purpose, has seized upon certain of said plants and machinery and taken and appropriated the same, and deprived the plaintiffs of the possession thereof," etc. The fifth additional count charges that, by reason of the alleged refusal of the city to be bound by the terms of said contracts, said tools, plant, machinery, fixtures and equipment have become of no value to the plaintiffs and utterly lost to them, whereby they have suffered damage in the sum of $250,-000.00; that the city by its wrongful acts has further damaged plaintiffs and is indebted to plaintiffs in the further sum of $35,000.00 for the cost of maintenance, and in the further sum of $20,000.00 for interest upon the moneys of plaintiffs, invested in said plant, etc.; and in the further sum of $75,000.00, withheld by the city from the payments to be made to plaintiffs as the so-called fifteen per cent reservation; and in the further sum of $25,000.00 by depreciation in value of said plant, etc., caused by the wrongful acts of the city; and in the further sum of $100,000.00 for special damages to plaintiffs by preventing them from completing the work; and there is due to plaintiffs from the city a large sum of money, to-wit, $650,000.00, being the amount of damage by reason of the wrongful termination of said contracts and the prevention of plaintiffs from completing the same; and that the city is indebted to the plaintiffs in the sum of $1,000,000.00, etc.

On July 6, 1899, the city filed an amended copy of account in support of their plea of set-off. The city also filed on July 6, 1899, a plea of the general issue sworn to, and a further plea setting up the execution of the contract of October 19, 1895, and the specifications thereto attached, and alleging that said contract of October 19, 1895, constituted and was the only promise and under-

taking of the city referred to and charged in said counts and each of them, and that no other or different contract, undertaking or promise than as contained in said instrument in writing dated October 19, 1895, was ever made by the city, to or with the plaintiffs or any of them, etc.

*Second—The effect of the new allegations made by the fourth and fifth additional counts to the declaration, and of the new issues formed by such allegations during the trial and at a time when the trial of the cause was approaching its close.*

The original contract of October 19, 1895, which is admitted by both sides to have been executed and to be binding upon both parties, provides, among other things, that "no payment will be made for any extra work not specified in this contract, unless such extra work shall have been done by the written order of the commissioner of public works, to be attached to such contract, directing the same, and stating that such work is not included in the contract, what the extras are, and that such extras are necessary for the proper completion of, or for the security of the work previously done, and the reasons therefor."

The additional counts, filed on July 3, 1899, after the trial of the cause had lasted some eleven days, averred, "that said original contract was so modified that said supplemental agreement, proposition, resolution and stipulation were, by the mutual agreement and consent of the parties, substituted for and accepted and adopted as the written orders for extra work required by the provisions in the original contract," as above quoted.

The first instruction given for the plaintiffs upon the trial below was as follows:

"The jury are instructed that, if they believe from the evidence that plaintiffs performed labor and furnished materials for the city of Chicago in the construction of section 3 of the north-west land tunnel in question under and in accordance with the terms of a contract or contracts therefor between the plaintiffs and the defendant,

as alleged in the declaration or any count thereof, and that the plaintiffs have not been paid therefor, then the plaintiffs are entitled to recover herein for the same at the price or prices fixed by such contract or contracts therefor."

By this instruction the attention of the jury was called specifically to "the terms of a contract or contracts * * * as alleged in the declaration or any count thereof." The fourth and fifth additional counts, filed in the midst of the trial, were as much a part of the declaration as any of the other counts thereof, and are included within the meaning of the expression "any count thereof." Therefore, the minds of the jury were directed to the new contract set up in the new and additional counts. These counts alleged that there was an agreement between the parties, by the terms of which the supplemental agreement of May 17, 1897, and the proposition to the mayor of June 28, 1898, and the resolution of July 11, 1898, and the stipulation made on October 8, 1898, were substituted for and accepted and adopted as the written orders for extra work, required by the original contract. There is no evidence whatever in the record, so far as we have been able to discover, that any agreement was made between the city and the plaintiffs, by which the documents and instruments last referred to were to be regarded as substitutes for the written orders required by the contract of October 19, 1895. The first instruction given for the plaintiffs was broad enough in its terms to include this contract, and, as applicable to that contract, the instruction was erroneous because there was no evidence upon which to base it.. By the instruction the right of the plaintiffs to recover was based upon the condition that they had performed labor and furnished materials in accordance with the terms of any contract mentioned in any count of the declaration. The contractors were not to be paid for extra work, except where it was done by the written order of the commissioner of public works.

The first instruction told the jury that the parties had agreed to accept certain instruments in writing as substitutes for the written orders so required. There being no evidence to support the existence of any such contract as that, the instruction was wrong.

Again, the additional counts charge the city with making false and fraudulent estimates for the fraudulent purpose of depriving plaintiffs of the compensation, to which they were entitled, and for the purpose of making the contracts so burdensome and unprofitable to them as to compel them to abandon the work. So far as we have been able to discover, there was no proof whatever in the record to sustain this allegation of the additional counts. The notice of the forfeiture of the contract of October 19, 1895, attached as an exhibit to the fourth additional count, is alleged to have been served upon the plaintiffs as a part of the alleged fraudulent conduct of the city as thus specified. By the terms of the contract of October 19, 1895, it was provided that, if the rate, at which the work should be performed, should not, in the judgment of the commissioner of public works, be such as to insure its progress and completion in the time and manner stipulated, or if the work should be wholly or in part improperly constructed, the commissioner of public works of the city had the right to declare the contract forfeited as to a portion or the whole of the work and to re-let the same. In pursuance of the power conferred by the original contract the notice of forfeiture was served, and yet the giving of that notice, and the action of the city taken under and in pursuance of it, are charged in the additional counts to be the culmination of a fraudulent scheme to compel the plaintiffs to abandon the work. The fifth instruction given for the plaintiffs begins as follows: "If the jury believe from the evidence that the defendant wrongfully seized and appropriated to its own use the plant or property of the plaintiffs, in manner and form as averred in the declaration or any count thereof,

then the plaintiffs are entitled to recover," etc. By this instruction the attention of the jury was directed to the additional counts, which charged the fraud therein alleged against the city. The right of the plaintiffs to recover was conditioned upon the finding of the jury that the city had seized the plant of the plaintiffs in pursuance of a fraudulent scheme to compel the plaintiffs to quit the work. As there was no evidence whatever of any such fraudulent scheme on the part of the city, this instruction clearly was not based upon the evidence.

*Third*—One of the principal questions in the case relates to the alleged contract of May 17, 1897. It is claimed by appellees that the contract was valid and a binding obligation upon the city. On the other hand, it is contended by the city that the contract was void and invalid, and that the city was not bound thereby, or by any of the actions of the parties taken thereunder.

The contract of May 17, 1897, was signed by the members of the firm of Weir, McKechney & Co., the contractors, but was never signed by the city of Chicago, or by any of its officials. It was claimed by the contractors that, after making excavations for the purpose of constructing the tunnel in rock and in earth separately, they began to make their excavations through a new material, called by them "conglomerate," a substance claimed by them to be like neither rock nor earth, but classified as "material encountered in earth tunnel that is rock or of such a nature that it is classified as rock." One of the witnesses defined "conglomerate" as "rock formed by the cementing together of gravel stones and boulders by argillaceous and silicious cement, making it rock; a homogeneous mass so that, when it breaks, it doesn't separate the pebbles but breaks as one mass." "Conglomerate" is defined as rock composed of particles of pre-existent rocks cemented together, so as to make a uniformly solid substance. (1 Century Dict. p. 1191; Webster's Int. Dict. title "Conglomerate;" Standard Dict. same title.) The

contractors claimed that this conglomerate substance or material was not provided for in the original contract of October 19, 1895, and that, therefore, they were not obliged to make excavations through it at the prices fixed by the contract of October 19, 1895. Accordingly, as the testimony tends to show, some verbal arrangement was made with a former superintendent of public works of the city, named Downey, by which the contractors were to be allowed $6.00, instead of $2.00, per cubic yard for rock excavation, and $10.00 per cubic yard for back masonry, instead of nothing for such back masonry. The price, allowed by the contract of October 19, 1895, for rock excavation over and above cost of lineal foot of tunnel or shaft, was $2.00 per cubic yard, so that the allowance of $6.00 per cubic yard by the alleged contract of May 17, 1897, was an increase over the amount allowed by the former contract. As will appear hereafter, the contract of October 19, 1895, allowed nothing for back masonry, and the alleged contract of May 17, 1897, in providing for a payment to the contractors of $10.00 per cubic yard for such back masonry, made a material change in the terms of the former contract in this respect. Some time in April, 1897, Downey went out of office, and a new superintendent of public works by the name of McGann was appointed by the mayor. The unsigned contract of May 17, 1897, was prepared by the contractors, or in their interest, as embodying the former verbal arrangement with superintendent, Downey. The contract of May 17, 1897, after being drafted and signed by Weir, McKechney & Co., was presented to superintendent McGann, but was never signed by any city official. McGann testifies that he never said that he would sign the contract of May 17, 1897, or execute it; that he never asked McKechney to sign it; that its terms were never agreed to or assented to by him.

The question then arises, whether this alleged contract of May 17, 1897, which was never signed by the city,

or any of its officials, was a valid and binding contract, so far as the city was concerned.  Undoubtedly, the city officials, after May 17, 1897, paid from time to time to the contractors for material encountered in earth tunnel that was rock, or of such a nature that it was classified as rock, at the rate of $6.00 per cubic yard, in addition to the lineal foot price;  and also in earth tunnel, or in tunnel which was excavated partly in earth and partly in rock, where extra masonry was directed to be placed between the upper quarters outside the regular specified rings of brick work of the tunnel and the crown bars or planks to protect the work, the city paid the contractors the price of $10.00 per cubic yard for such back masonry. Such back masonry is thus defined in *City of Chicago* v. *Weir*, 165 Ill. 582:  "In blasting the opening in the rock for the tunnel, owing to the formation of the rock the opening was in many places made larger than was required for the tunnel.  This space had to be filled up with brick work, which is called 'back masonry.'"  But the evidence tends to show that these amounts of $6.00 per cubic yard for rock excavation, and $10.00 per cubic yard for back masonry, were paid by the city in order to secure a continuation of the construction of the tunnel, and prevent the stoppages of work by the contractors which had occurred.  Such amounts, if in excess of what the city was authorized to pay, were to be paid back to the city, or to be deducted from the moneys due to the contractors, which were held in reserve.  In the case of *City of Chicago* v. *Weir, supra,* this court had decided that, where an over-payment had been made upon this same contract of October 19, 1895, by the city to the contractors, such over-payment might properly be deducted from whatever sum might be due to the contractors for any portion of the work.  The contract of October 19, 1895, had provided that, if the rate of progress in the construction of the tunnel should be satisfactory to the commissioner of public works, estimates in the usual form would be issued

to the contractors, during the making of the improvements, for eighty-five per cent of the value of the work done and in place at the time of issuing such estimates, and the remaining fifteen per cent should be reserved until the final completion and acceptance of said work. The intention was, that any over-payments, which might be made, should be taken by the city out of the fifteen per cent so reserved. The fact, therefore, that the city may have paid out from time to time the amounts named in the contract of May 17, 1897, did not establish the adoption or acceptance of that contract by the city as a binding obligation.

The main ground, upon which it is claimed by appellees that the contract of May 17, 1897, though never signed by the city, or any of its officials, was binding upon the city, is an alleged ratification of that contract, claimed to have been made by certain proceedings taken by the city council, and some of the city officials, subsequently to May 17, 1897. The principal question, therefore, to be considered in determining whether or not the contract of May 17, 1897, was binding upon the city, is the question whether or not that contract was in any way ratified by the city. The proceedings, taken by the city and its officials, which are alleged to amount to such ratification were substantially as follows:

On May 23, 1897, as we understand the record, the city council appointed a committee to investigate the matter of the delay in the construction of the north-west land tunnel. This committee made a report to the city council on or about July 11, 1898, accompanying their report by a letter written to the mayor of the city on June 28, 1898, by Weir, McKechney & Co., and also accompanied by a letter, dated July 9, 1898, written to the mayor of the city by a special counsel, who appears to have been appointed by the mayor for the purpose of investigating the matter. The report, made by the committee to the council on July 11, 1898, was concurred in by the city council

by a vote of sixty-four aldermen in favor of such concurrence, there being no vote against it.   At the same time, to-wit, on July 11, 1898, the city council adopted a resolution in relation to this matter.   Subsequently, on October 8, 1898, a new contract was signed by Weir, McKechney & Co., and by the city of Chicago by its commissioner of public works, which latter contract was approved by the mayor.   The report of the committee to the city council, with its accompanying letters, the resolution adopted by the city council on July 11, 1898, and the alleged contract of October 8, 1898, are all set out in full in the statement preceding this opinion.   We are unable, however, to see that there is anything in these documents or proceedings, which amounts to a ratification by the city of the contract of May 17, 1897.   On the contrary, all these proceedings and documents expressly reserve the validity of that contract as a question to be thereafter determined, and refer to it as a question at issue between the parties, and not yet settled.

For instance, in the report, made by the committee to the common council, which recommends that an arrangement be made with the contractors to at once proceed in the work of completing section 3 of said tunnel, the sixth recommendation is "that the pleadings in the pending suits between said contractors and the city be so changed as to cover and settle all controversies and matters at issue between the city and said contractors up to the time of the trial of said suits; and * * * that upon the hearing of said suits all questions in controversy shall be open for determination and decision without prejudice to either party by the making of the arrangement, under which work is resumed, and the making of any payments thereunder, so that the final judgment or decree may be in accordance with the rights of the parties upon the merits, as determined by the court, independent of such arrangement for the resumption of the work.   In the final adjustment the city to receive credit

for all moneys paid to said contractors on any account in connection with the construction of said section 3, and judgment to be rendered, if at all, against the city for the balance due, and in the event that an over-payment shall be found to have been made, the city to be entitled to recover the amount of such over-payment." It is quite clear from this language, that the arrangement, proposed by the committee, was to be subject to the future determination of the questions at issue between the parties. The questions thus in controversy were to remain open for determination and decision, and were not to be prejudiced by the making of the arrangement recommended by the committee. The judgment or decree to be thereafter rendered in the pending litigation was to be in accordance with the rights of the parties, as determined by the court upon the merits, without reference to, and independent of, the arrangement recommended by the committee for the resumption of the work. The sixth recommendation of the committee expressly recognized the fact, that over-payments might be found to have been made, and that, if it was finally determined that such over-payments had been made, the city was to be entitled to recover the amount of the same. What were the matters then at issue between the contractors and the city, which were recognized as pending on July 11, 1898, when the report was made? The pleadings already set forth show to some extent what those issues were. On March 11, 1898, in the present suit, being the case at bar, the city filed a plea of the general issue sworn to, and also a second plea averring in substance, that the contract of October 19, 1895, was the only contract, made by the city with Weir, McKechney & Co., the contractors. It is expressly averred in that second plea, filed on March 11, 1898, that no other or different contract, agreement, undertaking or promise than as contained in the contract of October 19, 1895, with the specifications attached, was ever made by the city with the contractors, or any, or

either of them. This was, substantially and in effect, a denial that the city had ever executed or intended to be bound by the contract of May 17, 1897. Therefore, one of the matters at issue between the city and the contractors on July 11, 1898, was the question whether the contract of May 17, 1897, was binding or not. The fourth plea, filed on March 11, 1898, by the city was a plea of set-off, alleging over-payments made by the city to the contractors, thus repudiating the idea that such payments were made under and in pursuance of the contract of May 17, 1897. Now then, as one of the issues between the parties was the validity of the contract of May 17, 1897, and as nothing stated in the report, or in the recommendations of the report, was to prejudice in any way the future determination of that issue, how can it be said that the report of the committee was a ratification of the contract of May 17, 1897? On the contrary, it was an express reservation of the validity of that contract for the future determination of the court.

All the other pleas filed by the city, as will be seen by an examination of the statement heretofore made, set up the fact that the only contract made between the city and the contractors, which the city regarded as binding upon it, was the contract of October 19, 1895, thereby denying the binding force of the alleged contract of May 17, 1897, upon the city. Again, in the answer filed by the city in April, 1898, to the bill, filed by the contractors in the superior court, the city alleged and claimed that the agreement of May 17, 1897, was void. Such was the contention of the city at every stage of the proceedings thereafter and theretofore.

The resolution, adopted by the city council on July 11, 1898, contains the same reservation, as the report of the committee, upon the subject of the questions at issue between the city and the contractors. By the terms of that resolution, it was resolved "that the commissioner of public works be, and he is hereby authorized, in mak-

ing estimates for work done by Weir, McKechney & Co. on section 3 of the north-west land tunnel, pending the settlement of the questions at issue between said contractors and the city, to allow said contractors, in addition to the lineal foot price, where the tunnel is in earth, $6.00 per cubic yard for rock, and for all material which shall be classified as rock; and, where the tunnel is in earth or partly in earth and partly in rock, to allow said contractors $10.00 per cubic yard for all extra masonry, directed to be placed between the upper quarters outside of the regular specified rings of brick work of the tunnel and the crown bars or plank to protect the work; the making of said estimates in said manner and payments made thereon, to be without prejudice to the rights of the city, and in nowise to affect the determination of the questions at issue between the city and said contractors." This resolution states, that the allowance to be made to the contractors is in nowise to affect the determination of the questions at issue between the city and the contractors, and, as the main question in issue between them at that time was the validity of the contract of May 17, 1897, the resolution was in no sense a ratification of that contract. The same reservation as to the determination of the matters then at issue between the city and the contractors is made in the letter of the contractors to the mayor, dated June 28, 1898, and in the letter of special counsel to the mayor dated July 9, 1898.

Again, the contract of October 8, 1898, contains the same reservation. The third clause of that contract provides, as the sixth recommendation of the report of the committee of the common council provided, that "all questions in controversy shall be open for determination and decision without prejudice to either party by the making of the arrangement, under which work has been resumed, and the making of any payment thereunder, so that the final judgment or decree may be in accordance with the rights of the parties upon the merits, as deter-

mined by the court, independent of such arrangement for the resumption of work. In the final adjustment the city shall be entitled to receive credit for all moneys·paid to said contractors on any account, in connection with the construction of said section 3; judgment to be rendered, if at all, against the city, for the balance due, and, in the event that an over-payment shall be found to have been made, the city to be entitled to recover the amount of such over-payment." Inasmuch as the contract of October 8, 1898, states that the arrangement therein referred to is to be without prejudice to the questions at issue between the parties, and inasmuch as the validity of the contract of May 17, 1897, was one of the questions at issue, it cannot be said that the contract of October 8, 1898, was a ratification of the contract of May 17, 1897. Instead of being a ratification, it left the validity of that contract, as did all the other documents and proceedings, for the future determination of the court.

Whether or not the resolution of July 11, 1898, or the report of the committee which preceded it, or the agreement of October 8, 1898, which followed it, were valid and binding upon the city, so far as they authorized the payment to the contractors of $6.00 per cubic yard for rock and for all material which should be classified as rock, in addition to the lineal foot price where the tunnel was in earth, and so far as they authorized the payment to the contractors of $10.00 per cubic yard for extra or back masonry, they had no reference to the payments, which had been made or to matters which had taken place prior to July 11, 1898. ·The report, the resolution, and the agreement of October 8, 1898, all refer to the future. For instance, the fifth section of the report of the committee recommends that the commissioner of public works issue estimates in regular form twice each month for work "which may hereafter be done." The resolution of July 11, 1898, provides that the commissioner of public works "is hereby authorized, in making

estimates for work done by Weir, McKechney & Co., * * * to allow such contractors," etc. The reference is to estimates thereafter to be made and to allowances thereafter to be made. So, also, the agreement of October 8, 1898, expressly provides that only work done since July 11, 1898, has been done in performance of the arrangement authorized by the city council. Such agreement also expressly provides that all payments, made by the city to the contractors since July 11, 1898, have been made under the arrangement so authorized. The second paragraph of the agreement also provides that the contractors "agree to proceed and complete the work called for by their said contract under the said arrangement, it being agreed that the commissioner of public works shall issue estimates in the regular form twice each month for work that may be done hereafter, the city paying on such estimates only the cost of the expense of such work, and in no event paying more than the amount called for by such estimates." Here, also, the transactions referred to are transactions that are to take place in the future. The estimates to be issued are estimates to be issued after October 8, 1898.

Inasmuch, therefore, as the report and its accompanying letters, and the resolution, and the agreement of October 8, 1898, all refer to future transactions taking place after July 11, 1898, they can in no sense refer to payments made by the city to the contractors theretofore, or to any occurrences taking place between the city and the contractors theretofore, or to any supposed compliance with the contract of May 17, 1897. The character of these proceedings and documents, as contemplating and referring to future transactions, negatives the idea that there was any intention on the part of the city to ratify the contract of May 17, 1897, or any payments made before July 11, 1898, to the contractors. The references, in the report of the committee to the common council, to the contract of May 17, 1897, were merely expressions of

opinion by the members of the council voting to concur in the report, but the concurrence of the council in the report of the committee did not bind the city as a legislative act. "A municipal corporation by accepting, that is, receiving the report of a committee of inquiry does not admit the truth of the facts stated therein; and such a report, though accepted by a vote of the corporation, is not admissible in evidence against it." (1 Dillon on Mun. Corp.—4th ed.—sec. 305).

It being true, then, that there was no ratification by the city, in the manner claimed, of the contract of May 17, 1897, it cannot be said that the contract, never having been signed by the city or any of its officials, was binding upon the city. If any arrangement at all of the kind, set forth in the alleged contract of May 17, 1897, existed between the city and the contractors, it was purely verbal and rested in parol, so far as the city is concerned. As the contract of May 17, 1897, materially changed the contract of October 19, 1895, which is admitted by both parties to be a valid and binding contract, were the changes, so made, valid and binding upon the city, or authorized by any of the terms of the contract of October 19, 1895?

We are unable to see how the contract of May 17, 1897, can be regarded as a valid and binding contract as against the city, in view of the provisions of the contract of October 19, 1895, and of the previous decisions of this court so far as the following provision of the contract of May 17, 1897, is concerned, to-wit: "*Fifth*—In earth tunnel or in tunnel, which is excavated partly in earth and partly in rock, where extra masonry is directed to be placed between the upper quarters, outside the regular specified rings of brick work of the tunnel and the crown bars or planks to protect the work, the same shall be allowed and estimated at the price of $10.00 per cubic yard." The specifications, attached to the contract of October 19, 1895, and which are thereby expressly

made a part of said contract, provide among other things, as follows: "When the tunnel is partly in earth and partly in rock, the contractor will be paid an additional price per cubic yard for rock excavation over and above the unit price per lineal foot of tunnel in earth. When the tunnel is in rock, the brick lining may, if deemed secure by the city engineer, be reduced one ring less of brick, and in all cases the masonry shall be brought to a true circular section. In every instance all spaces left between the outside of the regular brick work and the excavation, shall be filled in with solid brick masonry, but no allowance will be made for such additional work and material."

The specifications provide that "the tunnel shall be lined with brick masonry in three rings." The words: "in every instance all spaces left between the outside of the regular brick work and the excavation, shall be filled in with solid brick masonry, but no allowance will be made for such additional work and material," apply to excavations in all kinds of material, to-wit, to excavations when the tunnel is partly in earth and partly in rock, and to excavations when the tunnel is wholly in earth, or wholly in rock. It makes no difference, therefore, that the excavations of a part of the tunnel may have been through what is called by appellees, "conglomerate" substance or material. By the express terms of the contract of October 19, 1895, no allowance was to be made for back masonry, whether the excavation was through conglomerate material, or through all rock, or all earth. This provision of the contract of October 19, 1895, was construed and commented upon by this court in *City of Chicago* v. *Weir, supra,* where we said (p. 591): "In regard to the question, whether plaintiffs are entitled to compensation for filling with masonry the space between the brick line of the tunnel and the irregular excavation of the rock, that is settled by a plain provision found in the specifications, as follows: 'In every instance all spaces left

'between the outside of the regular brick work and the excavation shall be filled in with solid brick masonry, but no allowance will be made for such additional work and material.' This is so plain that argument in support of the language used is unnecessary." It was also held in *City of Chicago* v. *Weir, supra,* that the city was entitled to re-payment of all money it was shown to have paid out for back masonry.

Now, then, the fifth clause of the contract of May 17, 1897, which authorizes an allowance of $10.00 per cubic yard for extra or back masonry, is in direct violation of the contract of October 19, 1895, which provides that in "every instance" no allowance will be made for such back masonry. The city officials had no right or authority to make a verbal agreement or arrangement with the contractors, which was in direct violation of the contract of October 19, 1895, which had been let in pursuance of the statute to the lowest bidder after due advertisement for bids. The city officials had no right to agree verbally or orally to pay $10.00 per cubic yard for back masonry when the contract of October 19, 1895, provided that no allowance whatever should be made for such back masonry. To this extent, therefore, the contract of May 17, 1897, was absolutely void.

It follows that the trial court erred in admitting testimony, the effect of which was to hold the city liable for amounts paid out for back masonry at the rate of $10.00 per cubic yard prior to July 11, 1898.

The court also erred in giving instructions to the jury, which recognized the validity of the contract of May 17, 1897. The first instruction told the jury "that, if they believe(d) from the evidence that the plaintiffs performed labor and furnished materials for the city of Chicago in the construction of section 3 of the north-west land tunnel in question under and in accordance with the terms of a contract or contracts therefor between the plaintiffs and the defendant, as alleged in the declaration or any

count thereof, and that the plaintiffs have not been paid therefor, then the plaintiffs are entitled to recover herein for the same at the price or prices fixed by such contract or contracts therefor." The contract of May 17, 1897, was one of the contracts alleged in the declaration, or in one of the counts thereof, and, consequently, the jury were told that the appellees were entitled to recover for back masonry at the price fixed by the contract of May 17, 1897. In view of what has been said, this instruction to the jury was clearly erroneous. For the same reason, the trial court erred in refusing to give the eighteenth instruction asked by the city upon the trial below. That instruction is as follows:

"The court further instructs the jury that the jury cannot allow to the plaintiffs any compensation in addition to the compensation for lineal foot of tunnel for any back masonry placed behind the outer rings of brick work in any portion of the tunnel which is constructed in rock."

The provision in the unsigned contract of May 17, 1897, in regard to the payment of $6.00 per cubic yard, in addition to the lineal foot price, for all material encountered in earth tunnel that is rock or of such a nature that it is classified as rock, presents greater difficulty than the provision of that contract in relation to back masonry. The specifications, attached to the contract of October 19, 1895, and which are a part of that contract, contain the following provision: "When the tunnel is partly in earth and partly in rock, the contractor will be paid an additional price per cubic yard for rock excavation over and above the unit price per lineal foot of tunnel in earth." The third section of the contract of May 17, 1897, bases the right to charge $6.00 per cubic yard, in addition to the lineal foot price for all material encountered in earth tunnel that is rock or of such a nature that it is classified as rock, upon the clause thus quoted from the specifications. It is claimed that the

commissioner of public works had a right to allow $6.00 per cubic yard, because the contractor was to be paid an additional price per cubic yard when the tunnel was. partly in earth and partly in rock. If this provision in the specifications authorized an allowance to the contractors of a greater price than any named in the contract of October 19, 1895, such allowance could only be made in the mode prescribed by that contract. "Public officers or agents are held more strictly within their prescribed powers than private general agents." (1 Dillon on Mun. Corp.—4th ed.—sec. 445; *Littler* v. *Jayne*, 124 Ill. 123; *Stuart* v. *Cambridge*, 125 Mass. 102; *Woodruff* v. *R. & P. Railroad Co.* 108 N. Y. 48; *Gillison* v. *Wanamaker*, 140 Pa. St. 358). The contract of October 19, 1895, provides, among other things, as follows: "No claim whatever will be made by the said parties of the first part for extra work or material, or for a greater amount of money than is herein stipulated to be paid, unless some changes in or additions to said work, requiring additional outlay by said parties of the first part, shall first have been ordered in writing by the said commissioner of public works. * * * No claim whatever will be made or allowed for extra work or material unless some changes or additions to the work herein specified or shown on the drawings requiring additional outlay by the contractor, shall have first been ordered in writing by the commissioner of public works. * * * No payment will be made for any extra work not specified in this contract, unless such extra work shall have been done by the written order of the commissioner of public works, to be attached to such contract, directing the same and stating that such work is not included in the contract, what the extras are, and that such extras are necessary for the proper completion of, or for the security of the work previously done, and the reasons therefor." An allowance of $6.00 per cubic yard, as fixed by the contract of May 17, 1897, was for a greater amount of money than

was stipulated for in the contract of October 19, 1895, and, therefore, if allowed at all, must have been allowed in pursuance of a written order. Our attention has been called to no evidence in the record, showing that the commissioner of public works made any such written order. The design of the contract of October 19, 1895, was to protect the city from claims for extra work, which might be based upon oral evidence after the work was completed. Hence, a mere verbal arrangement by any city official to pay the $6.00 per cubic yard in question could not be binding upon the city.

Section 50 of article 9 of the City and Village act, which was the charter of the city of Chicago at the time the transactions here involved took place, provides that "all contracts for the making of any public improvement, to be paid for in whole or in part by a special assessment, and any work or other public improvement, when the expense thereof shall exceed $500.00, shall be let to the lowest responsible bidder, in the manner to be prescribed by ordinance—such contracts to be approved by the mayor or president of the board of trustees: *Provided*, *however*, any such contract may be entered into by the proper officer without advertising for bids, and without such approval, by a vote of two-thirds of all the aldermen or trustees elected." It may be true that it would have been impracticable to re-advertise for bids, and let a new contract for the excavation, when the tunnel was partly in earth and partly in rock. But such a contract could have been made by the city council without such re-advertisement and re-letting, provided there was a vote in favor of the same by two-thirds of all the aldermen elected. It certainly was practicable to obtain such vote.

What has been said upon this subject so far, however, is based upon the supposition, that the clause above quoted from the specifications authorized the fixing of a new allowance for the excavation where the tunnel was

partly in earth and partly in rock, independently of any price fixed in the contract of October 19, 1895. Under the circumstances of this case, however, the price for excavation through such conglomerate substance or material was to be fixed in accordance with the terms of the contract of October 19, 1895, and not by an oral arrangement between the contractors and any city official.

The specifications provide, that "the tunnel will be located within the area shown colored on the plat attached to these specifications." The specifications also provide, that "the tunnels shall be on such lines and grades as may be determined by the city engineer. The depth of the center line of the tunnel will be approximately between seventy-five and eighty-five feet below the Chicago city datum." It is claimed by the appellees, that the city made certain changes in the work specified in the original agreement, both as respects the depth below city datum at which the tunnel was to be constructed, and also as respects the course or direction of section 3 of the tunnel. In other words, it is contended that the city fixed upon sixty-five feet below city datum as the center line of the tunnel, when the specifications required such center line to be approximately between seventy-five and eighty-five feet below the Chicago city datum. It is also claimed that the course or direction of the tunnel was so changed by the city, as to take a part of it outside of the area shown colored on the plat attached to the specifications. Appellees complain that, by reason of these changes as to the depth and direction so made by the city, this conglomerate material was encountered, and thereby increased the cost of the construction of the tunnel. It is not altogether clear from the evidence, that such conglomerate material may not have been encountered, if the center line of the tunnel had been between seventy-five and eighty-five feet, instead of sixty-five feet, below Chicago city datum. The specifications do not require that the center of the tun-

nel shall be between seventy-five and eighty-five feet below Chicago city datum, but that such center line shall be "approximately" between seventy-five and eighty-five feet below the city datum, and it is not clear that, even if the center of the tunnel was only sixty-five feet below city datum, it was not approximately between the distances named. But whether it was or not, it is expressly provided that the tunnel shall be built on such lines and grades as may be determined by the city engineer, and the provision in regard to the depth below city datum must be construed in connection with the discretion thus invested in the city engineer.

It cannot be said that the power of a city official to allow $6.00 per cubic yard for the excavation through the conglomerate substance by an oral arrangement with the contractors can be derived from the following provision of the contract, to-wit: "Should the commissioner of public works deem it proper or necessary in the execution of the work to make any alterations which shall increase or diminish the expense, such alterations shall not vitiate or annul the contract or agreement hereby entered into, but the said commissioner shall determine the value of the work so added or omitted, such value to be added to or to be deducted from the contract price as the case may be." Such a provision, as that last quoted, in a construction contract only justifies such changes as are incidental to the complete execution of the work described in the contract, and as are of minor importance, and gives no authority for changes involving material departures from the plans. (*County of Cook* v. *Harms*, 108 Ill. 151; *City of Chicago* v. *Sexton*, 115 id. 230). In *City of Elgin* v. *Joslyn*, 136 Ill. 525, we said (p. 531): "Where extra work, growing out of changes and alterations made in the original contract, is to be ordered and paid for upon the estimates of an architect or engineer, it will be presumed that only such changes and alterations are intended, as are of minor importance and incidental only

to the execution of the work described in the plans." If, as is claimed by the appellees, the excavation through conglomerate substance was caused by these alleged changes as to depth and direction, the increased cost to the amount of several hundred thousand dollars paid to the contractors would indicate that such changes were not of trifling or minor importance, or merely incidental to the execution of the work. Such could not be the character of alterations, which would appear to have doubled or nearly doubled the cost of the work.

On the contrary, the power to fix an increased price for the excavation through the conglomerate material would appear to be based upon the following provision of the specifications attached to the contract of October 19, 1895, to-wit: "The commissioner of public works reserves the right to make any changes in the foregoing plans and specifications that he may deem desirable or necessary or the emergency of the work may demand, and the contractor shall furnish any additional material and do any additional work required by such changes or emergency at the prices for like work stipulated in the contract." The plans here referred to were plans on file in the office of the department of public works of the city. One of these plans was a plat or map showing the area, within which section 3 of the tunnel was to be constructed. This map or plat was shown to the contractors and signed by them as part of their agreement. They are, therefore, bound by it as a part of their agreement. (*City of Elgin* v. *Joslyn*, 136 Ill. 525). There were also two other plats or maps showing the borings as platted. The specifications state that "borings have been made by the city near the proposed routes of the tunnels. The notes from these borings have been platted, and are now on file in the office of the city engineer for the inspection of bidders;" the three maps or plats showing the area of section 3 of the tunnel, and showing the borings made by the city near the proposed route of the tunnel, were

exhibited to the contractors when they signed the agreement, and, as introduced in evidence, bear the names of the contractors endorsed thereon.  These plats or maps tend to show that the center line of the tunnel was to be about sixty-five feet below Chicago city datum.  The first shaft, which was constructed, is known as the Keith street shaft.  When the city engineer or his assistant measured from the surface of the ground in the Keith street shaft a distance below the surface of sixty-five feet below Chicago city datum, and thereby indicated on each side of the shaft the center line or "eye" of the tunnel, the appellee, John McKechney one of the contractors, was present.  It also appears that the contractors during the progress of the work passed up and down the shafts daily.  This, and other evidence in the record, tends to show that the contractors were affected with notice that the center line of the tunnel was only about sixty-five feet below city datum.  There was other evidence tending to show that they did not know of the exact depth of such center line until as late as March, 1898.  But in view of the conflict in the evidence it was proper to submit the matter to the jury.  Therefore, the court should have given instruction No. 15 asked by the appellant, which told the jury that, if they believed from the evidence that the contractors knew that the center line of the tunnel had been located at or about sixty-five feet below Chicago city datum, appellees were not entitled to any damages on account of such facts.  It was error to refuse such instruction.

The two provisions in the specifications, one to the effect that the commissioner of public works had the right to make changes in the plans and specifications, and the contractor was bound to do any additional work required thereby "at the prices for like work stipulated in the contract," and the other to the effect that, "when the tunnel is partly in earth and partly in rock, the contractor will be paid an additional price per cubic yard

for rock excavation over and above the unit price per lineal foot of tunnel in earth," should be construed together. Appellees claim that the changes in the plans and specifications, made by the commissioner of public works, led up to an excavation which was partly in earth and partly in rock. Therefore, the additional work required thereby, should have been done by the contractors at the prices for like work stipulated in the contract. What is the price for like work, as stipulated in the contract? The contract of October 19, 1895, provides, among other things, as follows: "Rock excavation over and above cost of lineal foot of tunnel or shaft, $2.00 per cubic yard." The "rock excavation" applies to all-rock tunnel and includes tunnel in mixed earth and rock. Indeed, the contract of May 17, 1897, refers to "all material encountered in earth tunnel that is rock, or of such a nature that it is classified as rock." If it was rock, or of such a nature as to be classified as rock, it would come within the provision which provides for $2.00 per cubic yard for rock excavation, except that such additional price of $2.00 per cubic yard for rock excavation is over and above the unit price per lineal foot of tunnel in rock. It would seem to follow, therefore, that the contract of October 19, 1895, provided for the cost of tunneling partly in earth and partly in rock at the price of $2.00 per cubic yard over and above the unit price per lineal foot of tunnel in earth. This being so, the provision in the contract of May 17, 1897, providing for an allowance of $6.00 per cubic yard instead of $2.00 per cubic yard was unauthorized, and the city cannot be bound by such payments amounting to $6.00 per cubic yard. Therefore, the trial court erred in admitting evidence, tending to establish the liability of the city for the payment of $6.00 per cubic yard instead of $2.00.

*Fourth*—We are also of the opinion that the court below erred in allowing proof to be introduced to show the amount of exterior rock excavation, and in refusing to

give instruction No. 13 asked by the city, which is as follows:

"The jury are further instructed that, in arriving at your verdict in this case, you are not entitled under the contract of October 19, A. D. 1895, or under any other document or agreement in evidence before you, to allow to the plaintiffs any compensation for the excavating of any rock or material classified as rock, taken outside of the space occupied by the inside bore of the tunnel and the rings of brick surrounding it."

In constructing the tunnel, and especially where blasting was done, the rock would break at points outside of the cross-section, and thereby portions of the rock would be loosened, and it was necessary to remove the portions so loosened. In *City of Chicago* v. *Weir, supra*, it was held that the agreement to pay for rock excavation embraced rock excavated in all-rock work, but only within the cross-section lines or nominal bore of the tunnel. The material removed which was without the cross-section lines is spoken of in the record as exterior breakage. The fact that appellees were not entitled to any compensation, in addition to the compensation for lineal foot of tunnel, for any exterior rock excavation, or back masonry, in any portion of the tunnel, which was constructed in rock, was decided in the former litigation commenced by the appellees against the city in 1896. That matter, therefore, was *res judicata* as between the parties.

The opinion of this court in *City of Chicago* v. *Weir, supra*, shows that the amount, sued for by appellees in August, 1896, embraced the following items: "Removal of rock taken from outside said cross-section lines, $3503.70; back masonry put in during July, 1896, $4492.25." In a trial before the circuit court without a jury the court disallowed these items. Upon appeal by the contractors to the Appellate Court these rulings of the trial court were affirmed. (*Weir* v. *City of Chicago*, 67 Ill. App. 247). One of the questions, submitted to the circuit court in

that case by the stipulation between the parties, was "whether or not the contractors are entitled to compensation for the removal of rock which breaks outside of the cross-section lines as indicated by the engineer." That question was decided in favor of the city by the Appellate Court, which affirmed the ruling of the trial court, and such ruling, not being assigned as cross-error by the contractors, was not passed upon in this court. The adverse decision of the Appellate Court on that subject was apparently submitted to. The circuit court having thus decided that appellees were not entitled to compensation for such exterior breakage or excavation, and that decision not having been questioned in any reviewing court, it still stands and is binding upon appellees. Where there has been a final judicial decision of a question of law or fact directly in issue by a competent court, and the same matter is again drawn in question between the same parties or their privies in a subsequent litigation, the former decision is conclusive. In the stipulation referred to, it was claimed by the contractors that such exterior rock excavation was inevitable, and, therefore, it cannot be said that the question of the necessity of such exterior excavation in the all-rock work makes the issue in this suit any different from the issue in the former suit. Nor has our attention been called to any evidence, tending to show that this exterior breakage in the all-rock work was the result of digging the tunnel at sixty-five feet below datum instead of "approximately between seventy-five and eighty-five feet below datum," if there is any difference between the two depths.

*Fifth*—Evidence of an arrangement between L. B. Jackson, the city engineer, and the contractors, by which the contractors were allowed $10.00 per cubic yard for the masonry in the third ring of brick in the mixed work, was improperly admitted, and the twelfth instruction asked by the city upon that subject should not have been refused. That instruction is as follows:

"The court further instructs the jury that it is provided by the written contract introduced in evidence in this case and dated the 19th day of October, A. D. 1895, that the tunnel, which by said contract said plaintiffs agreed to construct, shall be lined with brick masonry in three rings, or about thirteen inches in thickness, and that when the tunnel is in rock, the brick lining may, if deemed secure by the city engineer, be reduced one ring less of brick. Under the law applicable to this case it was not in the power of the city engineer to agree with the firm of Weir, McKechney & Co. that the defendant should pay to the firm of Weir, McKechney & Co. for the third ring of brick in the lining of any part of the tunnel anything whatever in addition to or outside of the unit price per lineal foot of tunnel, as agreed to be paid by the defendant to the firm of Weir, McKechney & Co. by said agreement of the 19th day of October, 1895."

The specifications provide as follows: "The tunnel shall be lined with brick masonry in three rings, or about thirteen inches in thickness." "When the tunnel is in rock, the brick lining may, if deemed secure by the city engineer, be reduced one ring less of brick." "The work as a whole, includes furnishing of all material and the construction of shafts and tunnels; all excavations; the pumping; the cleaning out of and off from the entire premises; and the removal of all refuse; the making of all repairs to the masonry, and the completion in a thorough and workmanlike manner, of all the work of every kind and description, included in the foregoing specifications, and shown on the drawings ready for use."

In *City of Chicago* v. *Weir*, *supra*, the decision related to work which was wholly in rock, and was to the effect that, where the third ring of brick was omitted in the all-rock work, no allowance could be made to the city therefor, and the contractors could not be allowed for filling with masonry the space, which would have been occupied by the third ring of brick if it had not been

omitted. In that case we said (p. 591): "In regard to an allowance where the third ring of brick mentioned in the contract is omitted by permission of the city engineer, the Appellate Court held that no allowance should be made either party, and in this we think the court was correct. The specifications contained this provision: 'When the tunnel is in rock, the brick lining may, if deemed secure by the city engineer, be reduced one ring less of brick, and in all cases the masonry shall be brought to a true circular section.' If an allowance had been intended to either party where the third ring of brick should be omitted, the contract or specifications would have contained a clause on that subject."

The third ring of brick appears to have been omitted from all of the work which was wholly in rock. The controversy here is as to the right of the contractors to recover for the masonry, which they placed in the space which was occupied by the third ring of brick in the mixed work. There is evidence, tending to show that what is called by the contractors "conglomerate" was nothing more than boulder clay or hard-pan, that is to say, boulder clay, when containing pebbles, and hard-pan, when free from pebbles. Many of the expert witnesses testified that the samples of so-called conglomerate produced by appellees were boulder clay and hard-pan. If this evidence was believed by the jury, then no extra allowance should have been made for excavation through this material, because the specifications, attached to the contract of October 19, 1895, provided, among other things, as follows: "No extra allowance will be made for quicksand, hard-pan or boulders." The contractors offered in evidence a letter, written by Weir, McKechney & Co. to L. B. Jackson, the city engineer, setting forth an arrangement made between the engineer and the contractors upon this subject. The letter was objected to, but the objection was overruled and it was read. To this ruling of the court the city took exception. The clause of

the agreement of October 19, 1895, requiring the tunnel to be lined with three rings of brick, and the clause providing that where the tunnel is in rock, the brick lining may, if deemed secure by the city engineer, be reduced one ring less of brick, must mean that, where the tunnel is not in rock, the lining shall consist of three rings of brick. By the terms of this arrangement between Jackson and the contractors, the latter were to be allowed $10.00 a cubic yard for back masonry in the third ring of brick in the mixed work. This arrangement was void, because the third ring of brick in the mixed work was necessarily a part of the tunnel proper, and the price therefor was included in the lineal foot price of the tunnel. The third ring of brick appears to have been placed in all of the earth and mixed parts of the tunnel, and, so far as such third ring of brick in those portions of the tunnel is concerned, there was no alteration in the plans or specifications. The engineer had no power to bind the city to pay $10.00 per cubic yard for the third ring of brick as back masonry. When the third ring of brick was put in and made a part of the tunnel, the city could not be made to pay for it an additional price to the price of each lineal foot of tunnel. When such third ring was placed in the lining of the tunnel, it became a part of the completed tunnel to be paid for as such according to the original contract price. The original agreement required the contractors to fill in the space between the excavation and the lining with solid masonry without extra cost, and for doing what the contractors originally agreed to do for the lineal foot price of tunnel they were not entitled to receive the extra amount of $10.00 a yard. This arrangement seems to have been made with Jackson, the engineer, only a short time before he ceased to be city engineer and went into the service of the contractors.

*Sixth*—It is charged by the appellant, that the trial court erred in admitting in evidence a certain preliminary estimate, dated August 31, 1897, certifying that there

was due to the contractors from the city, under the agreement of October 19, 1895, the sum of $29,140.45 for work done by them in August, 1897. The objection, made to the introduction of this estimate, was, that it was merely signed by one of the assistant engineers of the city, but was not signed or approved by the city engineer or by the commissioner of public works. As we understand the evidence, this preliminary estimate was subsequently revised by the city engineer and the commissioner of public works, and the amount thereof was reduced by them to $18,855.05, and, as thus reduced, it was approved by the city engineer and commissioner of public works.

The original contract of October 19, 1895, provides, among other things, as follows: "It is also agreed by said city, that if the rate of progress shall be satisfactory to said commissioner of public works, estimates in the usual form will be issued to said party of the first part," (the contractors) "during the making of said improvements, for eighty-five per cent of the value of the work done and in place at the time of issuing such estimate, the remaining fifteen per cent being reserved until the final completion and acceptance of said work." The contract of October 19, 1895, provides that the water tunnel should be constructed under the supervision of the commissioner of public works and to his satisfaction, and that final payment should be made to the contractors when the work should have been accepted by the commissioner of public works. The latter was clothed with authority under the terms of the contract to pass judgment upon the work of the contractors, and to determine whether it was done according to the contract, and to make estimates for such parts of the work as in his judgment were done according to the contract. Under such provisions of the contract, the commissioner alone was competent to make an estimate which should be binding upon the city, and no estimate of his could be overcome, unless it was proven to be the result of fraud,

bad faith or willful disregard of duty on his part. (*Snell* v. *Brown*, 71 Ill. 133; *Gilmore* v. *Courtney*, 158 id. 432).

The evidence tends to show that, at the end of the month, a preliminary estimate of the value of the work done during that month would be made out by the assistant engineer upon a blank form prepared for that purpose, and submitted to the city engineer for his examination. The city engineer would revise such estimate if it was found to be incorrect, and approve it as revised, and, if it was found to be correct, he would approve it. Upon his approval of it, the estimate would be sent to the commissioner of public works for his final action. After an examination of more than fifty estimates, which were issued during the progress of the construction of the tunnel, we find that they are all endorsed as correct by the city engineer and approved by the commissioner of public works. It seems that a practice of showing some of these preliminary estimates to the contractors grew up among the assistant engineers. That is to say, the assistant engineer, when he made out such a preliminary estimate upon one of the blank forms, would give a duplicate thereof to the contractors as a special favor to them before the approval of the preliminary estimate by the city engineer, or the commissioner of public works. In pursuance of such practice, preliminary estimate No. 27 above referred to reached the hands of the contractors. It was written upon one of the estimate blanks of the city, and signed by one of the assistant engineers, and had upon it the initials of another assistant engineer, but was not signed or approved by the city engineer, or the superintendent of public works. When this preliminary estimate No. 27, certifying that the contractors were entitled to $29,140.45, was introduced in evidence, it was objected to by the city upon the ground that, not having been finally approved by the city engineer and the commissioner of public works, it was not the act of the city. But the court, over the objection of the city,

admitted the preliminary estimate in evidence. The corrected estimate, which was subsequently approved of by the city engineer and the commissioner of public works, was for a less amount than the preliminary estimate, as has already been stated.

The effect of this action by the court was to make the impression upon the jury that the contractors were entitled to the amount specified in the preliminary estimate, instead of the amount stated to be correct in the estimate finally corrected and approved. We think that the court erred in admitting this preliminary estimate in evidence. It was not prepared to be finally submitted to the contractors as a statement of the amount due them for the work done during the past month, but was merely prepared by the assistant engineer to be submitted to the engineer and the commissioner of public works for their final action. In other words, the preliminary estimate was merely a report by an agent of the city to a superior agent of the city for review and final action by such superior agent. It had no vitality until it was finally approved by the commissioner of public works.

Where suit was brought by contractors to recover for breach of a railroad construction contract, which provided that payments for the work should be made upon estimates certified by the engineer in chief of the company, and where the plaintiffs on the trial read in evidence estimates, made by a subordinate engineer of the company, not certified by its engineer in chief, it was held that the admission of such estimates was error. (*Tennessee Railroad Co.* v. *Danforth*, 112 Ala. 80; see also *Culver* v. *Alabama Midland Railway Co.* 108 Ala. 330; *Wabash Railroad Co.* v. *Farrell*, 79 Ill. App. 508; *Doyle* v. *St. P., M. & M. Ry. Co.* 42 Minn. 82; *Vicksburg Railroad Co.* v. *O'Brien*, 119 U. S. 99; *Ohio and Mississippi Railway Co.* v. *Atteberry*, 43 Ill. App. 80). The general doctrine is that a report made by an agent to his principal is not evidence against

the principal. (*In re Devala Co.* L. R. 22 Ch. Div. 593; *Langhorn* v. *Allnutt,* 4 Taunt. 511.)

*Seventh*—It is furthermore charged by the appellant that the court below erred in admitting in evidence certain letters, introduced by the appellees upon the trial below and read in the presence of the jury. A few of these letters were written to the contractors, Weir, McKechney & Co., by agents of their own, or experts employed by them to examine their work. The large majority of the letters, however, which were upwards of one hundred and fifty in number, were letters which had passed between the contractors and certain city officials. One of the questions in the case is, whether or not these letters were properly admitted in evidence under the circumstances shown by the proofs.

A large amount of evidence was taken on both sides upon the issue whether or not Weir, McKechney & Co., the contractors, did their work in the construction of the tunnel in a proper manner. It was insisted by the city officials at various times, during the progress of the work, that the contractors made the excavations in the work unnecessarily large, and thereby greatly increased the cost of the work to the city. For instance, it was claimed by the city that, in certain places where the normal section of the tunnel was wholly in rock and there was sufficient rock roof to support the tunnel, the contractors blasted out the rock roof to reach the earth above, and thereby make the tunnel part earth and part rock, so as to force the city to pay $6.00 instead of $2.00 per cubic yard for rock excavation and $10.00 per cubic yard for back masonry. The larger the cavities caused by the excavation, the greater the amount of back masonry required to fill such cavities. Of course, these charges of the city officials were denied by the contractors, and the evidence upon the subject was conflicting. We find in the record letters, written to the contractors by the city engineer and by the commissioner of public works, calling

their attention to these methods of doing the work, and demanding that the contractors should discontinue such methods, claiming that they resulted in making the excavations too large and the expense of the work to the city too great. The testimony, introduced by the city upon this subject with a view of showing this alleged improper method of construction, was introduced after appellees had read to the jury the letters so introduced in evidence.

There was much evidence, introduced upon both sides also upon the question as to whether the material, through which the tunnel was constructed, which was neither all rock nor all earth, was what was called "conglomerate" substance, or whether it was simply the boulder clay or hard-pan material mentioned in the contract of October 19, 1895. There was also much conflicting testimony upon the subject of exterior rock excavation and back masonry. Item 5 in the bill of particulars, filed by appellees, amounting to $60,592.99, was for outside breakage in all-rock work, and appellees claimed that this was caused by the alleged change in the depth of the tunnel. Item 6 amounting to $261,467.49 was for back masonry in all-rock work, and it was claimed by appellees that this was made necessary by such change in the depth of the tunnel. Item 7, amounting to $60,959.00 was for alleged discrepancies in estimates made by the commissioner of public works with the assistance of the city engineer. All these subjects were matters of dispute between the parties, and the evidence was conflicting in relation to the same.

The letters, introduced by the appellees and read before the jury, were substantially expressions of opinion on the part of the writers of such letters to the effect that the work done by appellees was properly done; and they were to a large extent arguments on the part of the writers in favor of the claims of the appellees as to such exterior excavation, back masonry and discrepancies in the estimates.

One of these letters was a report or opinion, dated January 29, 1898, prepared by William Sooy Smith, who was an agent in that regard for the contractors, and addressed by Smith to the contractors. In this report Smith said to the contractors: "Having this day completely examined the heading of drift No. 2, shaft No. 1, of the north-west land tunnel, now in the course of construction by you, I beg leave to submit the following report: * * * The material resting on this formation is indurated drift consisting of boulders, small and large, imbedded in a hard matrix of clay, sand and gravel. * * * The methods pursued in the excavation of the work seem careful and judicious, as the conditions which exist imperatively demand. * * * A just classification would undoubtedly characterize it as partly in solid rock and partly in loose rock and drift."

On January 26, 1898, Louis B. Jackson, who had been city engineer, but who had resigned his position and entered the service of the appellees, wrote a letter or report to the appellees in which he said, among other things: "The material lying over the rock is a conglomerate with strata of soft clay. * * * From close observation, I consider that you are employing the best methods in your construction and performing your work carefully and well. I do not consider the additional area caused by the falling in of the material outside of the true cross-section line as excessive, it is practically impossible to avoid this. Owing to the careful manner in which this work has to be done, and necessarily the bricking up of each day's excavation, it is impossible to make over two-thirds of the progress that could be made where the tunnel is in solid rock. Additional cost is consequent. In my opinion the entire area excavated should be measured and paid for at the price per cubic yard, named in your supplemental contract with the city; also, the caves that occur should be filled with masonry

to properly protect the tunnel and should be paid for at the price established by the city—$10.00 per cubic yard."

On August 24, 1898, William Sooy Smith wrote a letter to the contractors, in which he stated that he had carefully examined the headings of the tunnel they were constructing for the city, and he proceeds to make the following statements: "I brought a sample of the hard-pan from the second heading visited, weighing twenty-seven and one-half ounces. This I pulverized and dissolved in water, separating the sand and gravel from the cementing materials (mostly clay) present, and found that the sand and gravel it contained weighed twelve ounces. The materials in both headings, excepting the one foot stratum of sandy clay found in the first heading visited, is a conglomerate or hard-pan."

These letters were admitted in evidence over the objection of appellant, and their admission was excepted to. The objections were made in apt time. These letters and reports were written statements made to the appellees by their own paid agents. In other words, they were simply declarations made by agents to their principals. They were incompetent testimony, and should not have been admitted. They constituted nothing else than hearsay evidence made for the contractors by their own agents. In these letters the agents of the contractors expressed the opinion that the work, done by the contractors, was properly done, and that the material, about the character of which there was a dispute, was such material as the contractors claimed it to be. Surely, a party cannot be allowed thus to make evidence for himself. The introduction of these letters presents the case of a principal employing an agent to write him a letter, and then introducing such letter in evidence in the principal's behalf in the subsequent trial of an action at law, in which the agent is neither a party, nor interested, so far as the record discloses. The contents of these letters, thus read before the jury, were calculated to make an

unfavorable impression upon the jury to the injury of the city. The appellees, upon the trial below, also read in evidence a letter written by the firm of Weir, McKechney & Co. to the mayor of the city, dated August 11, 1897. This letter was never answered or noticed in any way by the mayor. It was an argument in favor of allowing the contractors for back masonry and exterior rock excavation in the all-rock work. These matters were matters of dispute between the parties, and the letter advocated the reasonableness of the claims of the contractors under items 5 and 6 of their bill of particulars, amounting to $322,060.48. This letter to the mayor of August 11, 1897, contained, among other statements, the following: "We believe that an equitable basis could be reached whereby we could be restricted to a certain limit. Take for instance the city of New York in the construction of their aqueduct. In framing their specifications (which was all through rock) they allowed the contractors compensation for the rock excavated and the back masonry to a limit of one foot outside the cross-section lines, they realizing that it would be impossible for the contractors to blast the rock to a neat cross-section line." It can not be said, that any action, taken by the city of New York in regard to paying for exterior rock excavation and back masonry in all-rock, had anything to do with the case at bar; but the court admitted this letter with the objectionable reference to the course pursued by New York, notwithstanding the objection thereto made by the appellant. The impression, liable to be made upon the minds of the jury, was that, if certain prices were allowed by the city of New York for certain work, the same prices ought to have been allowed to the contractors in the present case.

Again, on November 8, 1897, the contractors wrote a letter to the superintendent of public works of the city of Chicago, in which the writers criticise the city engineer, one of the chief witnesses for the city upon the trial

of the case. The letter was objected to, but was admitted in evidence by the trial court. It was calculated to discredit in advance the city engineer, who was to come before the jury as a witness. This letter makes, among others, the following statements: "In his [Ericson's] rambling conversation with the writer, he suggests referring the subject [of the construction of the May agreement] to the law department. We do not propose to hazard the risk of being classified as imbeciles by adopting any such suggestion. We believe the law department would be perfectly justified in asking an instanter order from the county court for a commitment to be examined as to our sanity. He [Ericson] also takes the position that it is singular that we had not made a claim for the balance of this material [the alleged conglomerate in drift 1] until recently. That is absolutely untrue.. * * .* There have been several discussions on this question with your city engineer [Ericson], and each time he has admitted it, and it was only a couple of days ago that he admitted to the writer that it [the material in drift 1] was conglomerate. We believe further comment on this question unnecessary. The gentleman [Ericson] then takes occasion to say to the writer that it is singular that, immediately after Mr. Barnes took charge of the work, the back masonry in drift 1 increased. The insinuation is not true and is unmanly. * * * We submit that he [Ericson] is not fair; that he is not treating us fair, nor treating his men fair. Every time an estimate comes into the office for work done by us, he reminds us of the pious silversmith in Gil Blas—throws up both hands and exclaims: 'This work is costing the city too much money.' If the city is not able to pay for its work it ought to stop it. * * * He admits that the material over the rock is conglomerate; he has admitted that over his own signature when he agreed to the former estimates. Perhaps, had the gentleman been more accurate in his borings he would have known the class of material that he had to

go through. * * * We submit, Mr. Commissioner, that this is not fair treatment," etc.

The appellees also read in evidence a letter, dated April 24, 1897, written by the contractors to the said commissioner of public works. This letter is an argument by the contractors in favor of certain claims made by them, to-wit, their claim for rock excavation at $6.00 per cubic yard, and their claim for damages on account of litigation and delay in the work, although the evidence shows that all of the litigation was begun by the contractors themselves. They also therein set up their claim for back masonry, although this court had decided that such claim could not be allowed. In this letter of April 24, 1897, the contractors make the following statement: "We state, as a fact, that commissioner Downey has paid the contractors on sections 1 and 2, Fitz-Simons & Connel Co. and Joseph Duffy, for back masonry, which he has refused to pay us. Commissioner Kent, Gen. Fitz-Simons, Joseph Duffy and the writer, Mr. McKechney, made a verbal agreement that we were all to receive $10.00 per cubic yard for the back masonry in addition to our contract price." The city objected strenuously to this part of the letter, but the trial court permitted it to be read. The matter, thus allowed to go to the jury, was not only incompetent, but it was prejudicial and harmful to the city. The jury would necessarily conclude from what was said in this letter, that the contractors should have pay for back masonry, because the contractors on the other sections, numbered 1 and 2, not involved in the present suit which concerns only section 3, had received pay for back masonry from the city.

We cannot notice any further the contents of the letters thus introduced, but are of the opinion that they were improperly admitted in evidence. The grounds, upon which the admission in evidence of these letters is sought to be sustained as proper, may be arranged generally under three heads: *First*, it is said that John Mc-

Kechney, one of the contractors, showed these documents to the commissioner of public works; *second,* that they were part of the *res gestæ;* and *third,* that the contract of October 19, 1895, required the contractors to deliver to the commissioner of public works on or before the 10th day of each month a written statement of the "amount of claims for extra work done or extra materials furnished during the previous month, or extra expenses incurred in the work," and that such letters and reports can be regarded as the written statements, thus required by the contract.

As to the first ground, there is no evidence to show that the commissioner of public works ever made any statement or admission in regard to the contents of any of these documents, or that they were shown to him at his request, or applied for by him in any way, or that they form a part of the correspondence between the contractors and any city officials. Contractors with a municipality cannot make evidence for themselves by showing to the municipal officers written reports or declarations of third persons, who are mere strangers, where the officer merely reads the documents and makes no admission in regard to them. "A letter written by a party is not admissible in his own favor, except as a notice or a demand." (13 Am. & Eng. Ency. of Law, p. 259). Letters, written by the contractors to the city officials, did not tend to prove or disprove any issue in the case, and were clearly inadmissible. Such testimony tended to prejudice the minds of the jury against the city, and in favor of the contractors. "The mere fact, that letters were received and remain unanswered, has no tendency to show an acquiescence of the party in the facts stated in them. A party is not to be driven into a correspondence of that character to protect himself from such consequences. In the case of *Firbee* v. *Denton,* 3 C. & P. 103, the plaintiff had sent a letter to the defendant, demanding a sum of money as due to him, to which no answer was returned.

On the offer to prove its contents * * * Lord Tenter-ton, C. J., observed: 'I am slow to admit that; what is said to a man before his face, he is in some degree called on to contradict, if he does not acquiesce in it; but the not answering the letter is quite different; and it is too much to say that a man by omitting to answer a letter at all events admits the truth of the statements that letter contains. I am of opinion, he observed, that this letter cannot be read.'" (*Hill* v. *Pratt*, 29 Vt. 119).

In *Bank* v. *Delafield*, 126 N.Y. 410, it was said: "We can see no ground upon which the letter is admissible. It is not in the nature of a declaration which the defendant admits by not answering, nor is it on the same plane as an oral declaration to the same effect, made in the presence of the party to be charged, and who may be regarded as admitting its truth by failing to deny it. This letter is a mere declaration of the writer, assuming in his own behalf to characterize and determine the nature of a past transaction, and it does not demand an answer, and is not admissible in evidence against the defendant. *Learned* v. *Tillotson*, 97 N. Y. 1; *Talcott* v. *Harris*, 93 id. 567."

In *Fearing* v. *Kimball*, 4 Allen, 125, it was said: "The general rule, that a party cannot make evidence for himself by his written communications addressed to the other party, as to the character of dealings between them, or the liability of the party to whom they are addressed, in the absence of any reply assenting to the same, is well settled. * * * Omitting to answer a written communication is no evidence of the truth of the facts therein stated, nor is a party under ordinary circumstances required to reply to a letter containing false statements of facts. * * * A party cannot make evidence for himself by his own declarations. * * * The omission to answer letters written to a party by a third person does not show an acquiescence in the facts there stated, as might be authorized to be inferred in the case of silence where verbal statements were made directly

to him." (*Waring* v. *United States Tel. Co.* 4 Daly, 233; *Child* v. *Grace*, 3 C. & P. 193; 1 Greenleaf on Evidence, sec. 199; *Moore* v. *Smith*, 14 S. & R. 393; *Robinson* v. *Fitchburg Railroad Co.* 7 Gray, 92).

In *Hammond* v. *Beeson*, 112 Mo. 190, it was said of the contents of such a letter: "These were declarations of a party in his own interest and should not have been read in evidence to the jury. A party is not allowed in that manner to make evidence for himself."

In *Dempsey* v. *Dobson*, 174 Pa. St. 122, it was said: "The letter, written after the plaintiff's color books had been returned to him, demanding that the copy that had been made should be given up to him, was inadmissible. It was an argumentative presentation of his view of his rights as an employe, and of the grievance of which he complained. It was unanswered. It was the declaration of the plaintiff in his own behalf, and was no more admissible because reduced to writing than it would have been if delivered orally."

Moreover, neither the contractors, nor the city officials, had any power to change in any material particular the terms of the contract of October 19, 1895, or make any new contracts or create new obligations on the part of the city. This being so, they could not write letters which should have that effect. The contractors could not affect the contract already made, or make a new one, by any letters they might write to the officials of the city, whether such official was the mayor or the commissioner of public works, because those officials were not clothed with the contracting power of the city. (*Sexton* v. *County of Cook*, 114 Ill. 174; *Stevens* v. *Coffeen*, 39 id. 148; *Clawson* v. *Munson*, 55 id. 394; *Clarkson* v. *Kerber*, 84 Ill. App. 658). The commissioner of public works, to whom the letters and reports were said to have been handed, was acting merely as a public officer, and had no implied power to make admissions against the city. (*Bouton* v. *McDonough County*, 84 Ill. 384; *Lee* v. *Munroe*, 7 Cranch, 366).

As to the second ground, upon which the admission of the letters is sought to be sustained, namely, that they were a part of the *res gestœ*, it is to be remarked that these letters were in fact merely narrative of past transactions, or expressions of opinion by the writers. To be a part of the *res gestœ* the declaration, whether verbal or written, must affect the act which is the subject of the inquiry, and explain, illustrate, qualify, or limit, or characterize it, and it must not be narrative of a past transaction, for, if it be wholly so, it will be entirely excluded, and if a part of the declaration be so, that part will be excluded. (*Chamberlain* v. *Chamberlain*, 116 Ill. 480; *Phenix Ins. Co.* v. *LaPointe*, 118 id. 384). These letters and reports cannot be regarded as a part of the *res gestœ*. Where the trial court admitted in evidence letters, written by plaintiff to defendant setting forth the plaintiff's claims and views in regard to the merits of the case, it was said, in regard to such evidence: "It was not the admission of his adversary, but was appellee's own statement and declaration, made long after the difficulties between the parties arose; nor was it any part of the *res gestœ* of the original transaction. It does not need the citation of authorities to show that the declarations of a party made after the transaction is closed, and which are merely a recital of the transaction such as the party then chooses to give, and especially offers by him to compromise, can not be used by him as evidence in his own favor." (*Rollins* v. *Duffy*, 14 Ill. App. 69).

The third ground, upon which it is sought to defend the admission of these letters and reports, is equally untenable. The contract of October 19, 1895, contained the following provision, to-wit: "The contractors must deliver to the commissioner of public works on or before the tenth day of each month a written statement of amount of claims, if any, for extra work done and extra materials furnished during the previous month, or for extra expenses incurred from any cause whatever; otherwise

claims for extras during that month will be forfeited and waived." None of these letters or reports can be regarded as statements of the amounts of any claims of the contractors. The clause in the contract thus quoted refers to a specific bill of particulars of the demands of the contractors for extras, giving the amount in dollars and cents. These letters and reports do not give the amounts of any such claims of the contractors, but consist of statements of opinions and conclusions by the authors of the letters. There is not one word in the letters or reports on the subject of extra work or materials, and no claim is made in them for anything in the nature of an extra, so far as we have been able to discover.

*Eighth*—We cannot resist the conclusion that the conduct of the trial judge upon the trial of this case was prejudicial to the rights of the city. At one stage in the course of the trial the trial judge made the following remark: "The city had better get somebody to do that work who can do it faster. If we can do it here in three or four days and the city can't get a man to do it outside of court in three or four months, they had better change their men or their system."

It would appear that the appellees, upon the trial below, were allowed about two weeks to introduce their evidence in chief. The remarks of the court during this time, as well as during the few days which were allowed to the city for the introduction of its testimony, were calculated, as we think, to prejudice the interests of the city before the jury. For instance, the following occurs in the testimony of one of the witnesses: "If you take a piece of conglomerate and put it in a wet cloth and wrap it in an oilcloth covering, I should not think there would be any effect upon it in two hours; it would remain as hard as it was when it was put there.

Mr. Sutherland: "It would remain as hard as it was when it was put there, would it?

A. "Yes, sir.

The court: "If there was no effect on it, it would be just the same wouldn't it? Don't ask silly questions. We have a whole lot to do here, to do our best, but we haven't any time for foolishness.

Mr. Sutherland: "I take an exception to the remarks of the court.

The court: "You will follow it just the same. I shall compel you to if you do not go on with your—"

Again, the following occurred:

"The material in drift 4 the last time I was there, was conglomerate.

Mr. Sutherland: "What was it? Leave out the word conglomerate and describe the condition of it as you saw it there.

The court: "You need not analyze conglomerate; they are well-known terms, and I am not going to let him give an analysis of what conglomerate would mean.

Mr. Sutherland: "They are well-known terms, your honor.

The court: "Do not talk to me at all. I have ruled on it, and I am not arguing with you.

Mr. Sutherland: "Does your honor rule I cannot ask him—

The court: "You heard my ruling. Proceed.

Mr. Sutherland: "I will take an exception.

The court: "That is your right. Now go on."

Again occurs the following:

Mr. Starr: "You may describe the joints used between the brick, whether the joints were clean and wet, or otherwise.

Mr. Sutherland: "That is objected to as leading. I do not think it is proper to read from the specifications and instruct the witness.

The court: "That is not reading from the specifications. He is asking what kind of joints there were.

Mr. Sutherland: "Let him state what was—

The court: "Stop. I will not have you stopping and interfering with the proceedings all the time when there is a ruling.

Mr. Sutherland: "I except to that.

The court: "This case must be tried the same as any other case, and you must observe the rules that are observed in courts generally, the same as any other lawyer. Let us go on that way.

Mr. Sutherland: "We try to do so, but we want to put our exceptions in.

The court: "If you do not go on I shall compel you to do it in such a manner that there will be no doubt about it.

Mr. Sutherland: "I take an exception to the court's remarks."

Again, the following occurred in the testimony of one of the witnesses:

"In my all-rock figures I did not include the part that was conglomerate. In that part of the tunnel which was part earth and part rock I figured the whole as one quantity.

Mr. Sutherland: "Did you figure it as rock?

The court: "Let us see what he wants. If there is any catch in it, let us get the catch. If it is a straight question, let us tell him what it is, so he will give us an answer."

It seems to us that this language of the court was calculated to make the impression upon the jury, that the counsel for the city was endeavoring to catch the witness, or, in other words, to deceive the witness. We see nothing in the conduct of the counsel, or in the character of the questions asked by him, which justified such an imputation on the part of the court.

One of the issues in the case was as to the quality and component parts of the material excavated by the contractors, the latter contending that it was the so-called conglomerate, or a material almost as hard as rock, and the city contending that it was not conglomerate,

but merely earth mixed with sand and gravel, with some rock or pebbles. If the material was such that it could have been excavated without blasting, it could have been bored with a common hand auger, that is, where the material was·earth. Some of the witnesses for the city so testified. The following occurred upon the cross-examination by the city's counsel of one of the witnesses of the appellees, to-wit:

Mr. Sutherland: "If it had not been for those rock or pebbles, you could have used augers all the while couldn't you? ·

. The court: "Yes, if it was all mud and you could use a hand auger. Let us go to something that is not silly. What next?

Mr. Sutherland: "I take an exception to the remark of the court.".

It was charged by the appellees upon the trial below, as we understand the evidence, that there was a conversion by the city of the plant of appellees on July 8, 1899, nineteen months after the suit was brought and several days after the commencement of the trial. The appellees introduced evidence as to the value of the plant alleged to be converted, and claimed $63,086.21 therefor. There was evidence, tending to show that there was no appropriation of the plant by the city, or that it was not at any time seized by the city. The notice of forfeiture, served upon the contractors by the city on June 22, 1899, notified them to remove their property from the tunnel at once, and, they not having done so, it was necessary for the city to take charge of a portion of it. It may be a question whether this was an appropriation in law, as the property was upon the ground of the city, and still remained there. Upon this subject, the following occurs in the testimony of one of the witnesses:

"Item 49 of bill of particulars, for 130,000 brick at shaft 5, refers to brick on hand there, on the surface of the ground at the shaft house.

Mr. Munroe: "I object to the evidence in regard to that item.

The court: "Has the city refused to let you take this away?

Mr. Munroe: "The city notified plaintiffs to move their plant, and invites them now to remove it, and they won't say whether they will take it away or not. We now request plaintiffs to remove their plant and all their material from section 3 of north-west land tunnel.

Mr. Miller: "You may state the cost of the 130,000 brick referred to in item 49, which Weir, McKechney & Co. paid. Can you state it? (Said question was objected to by defendant as incompetent and immaterial, but the objection was overruled by the court, and to said ruling defendant then and there duly excepted).

The witness: "I can state it; it was $6.50 per thousand, or $845.00 for the whole, or $845.00 altogether."

The remark of the court, "Has the city refused to let you take this away," could have had no other effect than to prejudice the city in the minds of the jury, because it led them to believe that there had been a misappropriation of the property by the city. It was a pure assumption that this property had been appropriated by the city. The evidence tends to show that it had never been taken possession of by the city, and, therefore, evidence of its value should not have been admitted.

The following also occurs:

Mr. Munroe: "You charge the city for this plant, although on the 27th day of October, 1898, it notified you where the plant was and requested you to either take it away, or notify the department of public works to what place you wished it removed.

The witness: "Two months after they stole it from us, they notified us, yes.

Mr. Munroe: "I move that the words 'two months after they stole it from us' be stricken out. I do not think that is a proper answer.

The court: "He might use more elegant language to indicate what he meant, but I cannot frame the language that the witness should use, so long as it does not violate the propriety of the occasion.

Mr. Munroe: "I will take an exception."

One of the material questions in the case being whether the city had wrongfully appropriated this plant to its own use or not, so as to render the city liable to the contractors for its value, the statement of the witness, that the city had stolen the property from them, was an improper statement, but was substantially endorsed by the trial court. Instead of rebuking the witness for his remark, the words of the court rather tended to commend the language of the witness.

On July 10, 1899, the city had begun to put in its evidence, and the following occurred:

Mr. Sutherland: "I expect to show by this witness that he saw them putting in brick back of the rings of brick without any mortar at all.

The court: "Certainly there is no mortar between the brick when they are laid in there.

Mr. Sutherland: "The contract requires the contractor to put back masonry in there. They cannot put dry brick in.

The court: "Go on, sir.

The witness: "While I was there I saw the masons laying brick in, sometimes two or three at a time, in the back above the three rings of brick, in the back filling, without mortar.

Mr. Miller: "Objected to.

The court: "Of course they went in without mortar. The mortar was put in afterwards I suppose. He did not stay there long enough to see it.

Mr. Sutherland: "Did you stay there long enough to see the work finished as they went along?

The witness: "Yes, sir, I was; two or three tiers of brick put in one ahead of the other. They back out to

the end of the arch. It is not a fact that they put in a lot of brick and then put the mortar over it afterward. I stayed there long enough to see one course filled up to the roof, and another course put in, in front of that up to the roof. I have been down there to put the lights in when they were putting in slabs over the timber or the crown bars. They would fill them up with slabs, up above those timbers. That was in drift 5."

The contract provided that, in every instance all spaces left between the outside of the regular brick work and the excavation, should be filled in with solid brick masonry, but that no allowance should be made for such additional work and material, and also provides that all joints in the masonry must be perfectly filled by pressing the bricks in the cement mortar, and not by pressing the mortar between the bricks. In order to comply with the terms of the contract, the entire exterior spaces were to be filled in with brick masonry, that is to say, brick laid in mortar. (*Weir* v. *City of Chicago, supra*). The city had a right to show, if it could, that the contractors had not filled in these exterior spaces as required by the contract, but had filled them with dry brick uncemented with mortar. Therefore, the language of the court, as above quoted, was calculated to make the impression upon the jury that, in his opinion, the contractors had done the work properly, inasmuch as the judge said that the mortar was put in afterwards, and that the witness did not stay long enough to see it. Certainly, this language of the judge amounted to a passing by the court upon the evidence when it was the province of the jury to pass upon it.

Again, the following occurred:

The court: "If he wanted to make his computations he should have made them from those in the record. If you wanted, as a matter of evidence, to make them from those books, he might have compared them with those in evidence.

Mr. Munroe: "We will compare them to-night,

The court: "Go on with this witness now.

Mr. Munroe: "I suppose I may offer to show the total amount of rock excavation in the all-rock parts of the tunnel, and the total amount of back masonry?

The court: "He may do his figuring to-night. He may take these figures from the cross-sections that are in evidence and put them in duplicate form.

Mr. Munroe: "It cannot be done in one night.

The court: "I am not going to string this out indefinitely, because you have not done what you should have done.

Mr. Munroe: "With a sufficient force we can compare our books with the plaintiff's books to-night, if your honor will adjourn now.

The court: "I will not adjourn now. Go on with this examination. This is the last of your witnesses?

Mr. Munroe: "This is the last witness except on the question of the valuation of the plant."

From the showing of the record, it would appear that the evidence was not introduced, as the testimony was closed on the same night, the taking of the testimony for the appellees having occupied two weeks, and for the city three and one-half days only.

The following occurred in the examination of a witness for the city:

Mr. Munroe: "What do you say as to the necessity of the large excavation in drift 4, which you have described?

Mr. Miller: "Objected to.

The court: "Objection sustained. (To said ruling of the court defendant then and there duly excepted.)

Mr. Munroe: "Are you able to state whether that large excavation was or was not necessary?

The witness: "Yes, sir.

The court: "Of course he is able to state, if he is able to talk.

The witness: "I know whether that large excavation was necessary. It was not necessary,"

The following also occurred on the evening of the 13th of July, 1899:

Mr. Munroe: "That is our case as far as we have been able to obtain the evidence up to this time. It is now nineteen minutes to eight o'clock in the evening.

The court: "That is all your evidence, is it?

Mr. Munroe: "That is all the evidence we have here.

The court to plaintiffs' counsel: "Call your witnesses on rebuttal. If not, I will send you to the argument."

The jury was instructed on the next morning.

The remarks, made by the court during the progress of the trial, as above quoted, had a tendency to prejudice the jury against the city, especially when considered in connection with the derogatory remarks made about the city and its officials in the letters which were improperly admitted, and also in connection with the additional counts added to the declaration a few days before the close of the trial, which counts made charges of fraud against the city which had not been before made, and in support of which there was no evidence. The instructions to the jury expressly referred to each count of the declaration, and therefore included these new counts. It is true that, in two instructions given by the court, the jury were told that the remarks made by the court admonishing the counsel as to their duties, and commenting upon the proper manner for the conduct of the trial, were to be disregarded by the jury, but we do not think that these instructions were calculated altogether to remove the unpleasant impression made upon the minds of the jury by the language used by the trial judge. Many of the remarks were not made in ruling upon motions made by counsel, but were volunteered by the court, and were not entirely covered by the language used in the instructions. The dangerous tendency of the remarks that were made cannot always be obviated or cured by instructions. (*Lafayette, Bloomington and Mississippi Railroad Co.* v. *Winslow,* 66 Ill. 219; *Lycoming Fire Ins. Co.* v. *Rubin,* 79 id. 402).

Many other points and objections are urged on behalf of the city in favor of a reversal of this judgment. . Upon these we pass no opinion, and the fact, that they are not here discussed, does not indicate whether we regard them as well taken or not.

For the errors above indicated, we think that there should be another trial of this case. Accordingly, the judgments of the Appellate and of the circuit courts are reversed, and the cause is remanded to the circuit court for further proceedings.    *Reversed and remanded.*

HAND, C. J., WILKIN, CARTWRIGHT and BOGGS, JJ., specially concurring:

We concur in the conclusion reached in the foregoing opinion that the judgment should be reversed but do not agree to all that is said therein. We base our opinion that the case should be reversed upon the ground, mainly, that the court erred in admitting in evidence the letters and reports written to the plaintiffs and made to them by their own agents, attorneys and other employees, and which were not proper evidence against the city. We think whether or not the supplemental agreement referred to in the opinion was ratified should be left open to be determined upon the next trial, and that in case it should be found that said supplemental agreement is not binding upon the city the plaintiffs should be allowed to recover the reasonable value of all labor and material furnished the city and accepted by it which is not covered by the terms of the original agreement but which was furnished by the plaintiffs in the construction of the improvement. We are also of the opinion that on the further hearing the evidence should be confined to the proof of a cause of action which existed at the time suit was commenced, and that proof that the city converted the plant of the plaintiffs during the former trial should not be heard unless agreed to by the parties.